IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 33328-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | OPINION PUBLISHED |
| | ) | IN PART |
| JOHN JOSEPH MUNZANREDER, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| JUAN PABLO IBANEZ-CORTEZ, | ) | |
| | ) | |
| Defendant. | ) | |

LAWRENCE-BERREY, J. — John J. Munzanreder appeals his conviction for the first

degree murder of his wife. Because of the sensational nature of the alleged crime, local

media extensively covered his case from arrest through trial. His principal arguments on

appeal are the trial court abused its discretion when it denied his motion to change venue,

and the voir dire process used by the trial court failed to protect his constitutional right to

an impartial jury.

In the published portion of this opinion, we hold that the state constitutional right

to an impartial jury is not more protective than the corresponding federal constitutional

right, that the voir dire process used by the trial court protected Munzanreder's constitutional right to an impartial jury, and that the trial court did not abuse its discretion when it denied Munzanreder's motion to change venue. We affirm Munzanreder's conviction, remand for two technical corrections to the judgment and sentence, and deny the State an award of appellate costs.

## FACTS

### Background facts

Munzanreder worked with Juan Ibanez at Valley Ford in Yakima, Washington. In early February 2013, Ibanez approached Munzanreder and asked him for money for a toolbox. Munzanreder agreed to give him the money if he helped get rid of somebody. Munzanreder told Ibanez that he wanted help killing his wife, Cynthia, and would give him $20,000. Ibanez said he would help, but he would not kill her.

Munzanreder gave Ibanez cash and directed him to purchase a gun. Munzanreder told Ibanez his plan: Munzanreder and his wife would go the movies, he would shoot her with the new gun, he would then throw the gun to Ibanez in some nearby bushes, and Ibanez would run away with the gun.

On February 28, 2013, the Munzanreders went to see a movie at the Majestic Theater in Union Gap, Washington, a small city immediately south of Yakima. Ibanez

2

received a prearranged text message from Munzanreder that the plan would be executed and went to the theater and waited in the bushes adjacent to the theater's parking lot. After the movie, as the couple approached their car, Munzanreder shot his wife with the gun purchased by Ibanez. Munzanreder then threw the gun into the bushes where Ibanez waited. As Ibanez left the scene with the gun, he ran past a couple near his car.

Law enforcement arrived and questioned witnesses. Munzanreder told law enforcement he heard a shot and saw a man in black clothes running away. Munzanreder said he had followed the man, but fell and injured himself, developing a black eye.

Munzanreder's wife later died from her injuries.

Law enforcement continued to investigate. They interviewed Ibanez, whose car had been reported at the crime scene. Ibanez quickly confessed and told law enforcement of the details of the crime. Media coverage of both the murder and the arrests quickly saturated Yakima County.

*Procedural facts*

The State originally sought to try Munzanreder and Ibanez together. But due to the difficulty in excising references to Munzanreder from Ibanez's confession, the court ordered the trials severed. The State and Ibanez later reached a plea deal that involved Ibanez pleading guilty and testifying against Munzanreder.

Munzanreder's case proceeded to trial. Jury selection began on January 12, 2015, almost two years after the shooting. Of the 243 original venire jurors, nearly half were excused for hardship. The remaining venire jurors completed juror questionnaires.

Defense counsel and the State had worked together to create an agreed juror questionnaire. The purpose of the questionnaire was to uncover juror bias, so that the trial court and the parties could individually interview venire jurors with possible bias in open court but outside the presence of other venire jurors.

The questionnaire contained many questions, including questions focusing on pretrial publicity about the case. Those questions asked the venire jurors to list media sources they used, whether they generally believed the media, whether they thought the media was fair to both sides of a case, and what criminal cases they followed in the media. It also specifically asked about Munzanreder's case. The questionnaire asked venire jurors if they knew information about the case from any sources, and concluded the section by asking if they had formed any opinions about the case. The questionnaire also asked venire jurors if they wanted to discuss their answers separately from other jurors. The completed questionnaires revealed that 105 of the remaining 128 venire jurors knew about the case; of these 105, 24 had formed opinions; and of these 24, most believed Munzanreder was guilty.

4

The trial court and the parties agreed on which venire jurors would receive individual interviews in open court. The trial court and the parties questioned each venire juror about media exposure, opinions of the case, the presumption of innocence, and the ability to reach a verdict based on the law given and the facts presented at trial. After each interview concluded and the venire juror left the courtroom, the parties had an opportunity to challenge the venire juror for cause. Munzanreder challenged venire jurors 29, 49, 51, 89, 190, and 216 for cause. The trial court denied Munzanreder's for cause challenges to venire jurors 29, 49, 51, and 89, but granted them as to venire jurors 190 and 216. Later, the trial court excused venire juror 29.

Before the remaining venire panel returned to the courtroom, Munzanreder orally moved for a change of venue. The motion was anticipated because Munzanreder had earlier said he would make such a motion, and had provided the trial court and the State with copies of local media stories and media Facebook posts. The State, although opposing Munzanreder's motion, indicated the trial court might give additional peremptory challenges. Munzanreder responded that he might ask for additional peremptory challenges, but would not do so until after the court ruled on his motion. The trial court took the motion under advisement and said it would make its ruling later in the jury selection process.

5

The parties completed voir dire and then went through the process of selecting the jury. The trial court permitted each party 6 peremptory challenges for the first 12 jurors, and 1 additional peremptory challenge for each of the 3 alternate jurors. Munzanreder never asked for additional peremptory challenges.

The peremptory process began with the venire jurors sitting in numerical order with the lowest 12 numbered panel members being the presumed jurors. The parties alternated each of their peremptory challenges. Because of the number of venire jurors who remained, the number of peremptory challenges allowed, and the number of juror and alternative juror slots, it was not possible for venire juror 89, or any venire juror higher than 89, to be seated as a juror or alternate juror. For this reason, venire juror 89, one of the venire jurors whom Munzanreder had unsuccessfully challenged, could not have sat on the jury.

This left venire jurors 49 and 51 as the only venire jurors whom Munzanreder had unsuccessfully challenged for cause who could have sat as a juror or alternate juror. Munzanreder had six peremptory challenges to remove these two venire jurors. In exercising his six peremptory challenges, Munzanreder removed venire juror 49, but elected not to remove venire juror 51. Venire juror 51 was the only empaneled juror whom Munzanreder had unsuccessfully challenged for cause.

6

No. 33328-1-III
*State v. Munzanreder*

The panel was sworn in. The trial court provided the panel various preliminary

instructions and then excused them for lunch. With the panel excused, the trial court gave

its oral ruling denying Munzanreder's motion to change venue:

> Before we break, I need to put on the record—perhaps it's obvious. There
> was a motion for change of venue. The motion is denied.
>
> I was impressed by the quality of the panel. I was impressed by their
> promises and descriptions of how they would stay free of any outside
> influence or their representations as to how any influences might have
> impacted them.
>
> There has been coverage on this case. I, frankly, don't think it's as
> extensive as has been represented. A number of the identifications that
> have been offered, newspaper headlines, frankly, two of them startled me. I
> never saw those. I quickly looked at the date. They were approximately
> two years ago. I didn't recall them personally.
>
> I saw nothing in the dialog we had with the jurors that we've
> impaneled now that would suggest that they were in any way influenced or
> biased by the news coverage. I think we have an excellent panel.
>
> I also noted that the nature of the media coverage has changed over
> the years. The fact that TV might have covered this in the last week or two,
> I was also interested to see how few people really had seen it. News
> coverage is very diverse, and local coverage seems to be left out of the mix
> to a large extent.
>
> One of the comments that one of the panelists had made was that
> there have been so many homicides in Yakima that she couldn't tell whether
> it was this case or another that she was thinking about. Obviously that's not
> a good thing to say about the community. On the other hand, it certainly
> added to my belief that there was no particular prejudice by denying the
> motion.
>
> So the motion is denied.

1 Verbatim Report of Proceedings (VRP) (Jury Selection—Pretrial Motions) at 1231-32.

Over the next several days, the parties presented their evidence.

7

After the parties presented their evidence, the trial court conferred with the parties to discuss jury instructions. The State proposed a lesser included offense of second degree murder. Munzanreder objected, and asserted that the evidence did not support the inclusion of the lesser included offense. The trial court granted the State's request. The trial court later asked Munzanreder whether he had any objections or exceptions to the State's instructions, other than its decision to give the lesser included offense instruction. Munzanreder responded that he saw no difference between the State's offered instructions and his own. The trial court adopted the State's instructions, instructed the jury, and the parties gave their closing arguments.

The jury returned a guilty verdict on first degree murder with a firearm enhancement. The trial court sentenced Munzanreder to 340 months of incarceration. Munzanreder timely appealed.

## ANALYSIS

In the published portion of this opinion, we address Munzanreder's arguments that (1) the state constitutional right to an impartial jury provides greater protection than the corresponding federal constitutional right, (2) constitutional due process and the right to an impartial jury require a better process than the one used by the trial court to root out

bias, and (3) the trial court abused its discretion when it denied his motion to change venue.

In the unpublished portion of this opinion, we address Munzanreder's other arguments that (4) there was an error in the to-convict instruction for second degree murder, (5) there are two clerical errors in the judgment and sentence, and (6) this court should deny the State an award of appellate costs in the event it substantially prevails.

1. SCOPE OF STATE CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY

Munzanreder, providing a *Gunwall*[1] analysis, contends our state constitution provides greater protection for an accused's right to an impartial jury than the Sixth Amendment to the United States Constitution. Although the right to an impartial jury is protected in article I, section 22 of the Washington State Constitution, Munzanreder's analysis relies heavily on article I, section *21*'s right to a jury trial. The State, somewhat unhelpfully, does not provide its own *Gunwall* analysis.

This court engages in a *Gunwall* analysis to determine a claim whether the Washington State Constitution provides greater protection for a right than the United States Constitution. The six *Gunwall* factors are: (1) the textual language of the state constitution, (2) significant differences in the texts of parallel provisions of the federal

---

[1] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

and state constitutions, (3) state constitutional and common law history, (4) preexisting

state law, (5) differences in structure between the federal and state constitutions, and

(6) matters of particular state interest or local concern. *State v. Gunwall*, 106 Wn.2d 54,

61-62, 720 P.2d 808 (1986).

Neither party cites to *Rivera*, a case that contains a footnoted analysis of the article

I, section 22 right to an impartial jury under the *Gunwall* framework, and concludes that

the state and federal constitutions provide the same degree of protection. *State v. Rivera*,

108 Wn. App. 645, 648 n.2, 32 P.3d 292 (2001). Similarly, neither party mentions *Fire*, a

case that reaches the same conclusion but without undertaking a *Gunwall* analysis. *State

v. Fire*, 145 Wn.2d 152, 163, 34 P.3d 1218 (2001). Because *Rivera* analyzes the issue in

a footnote, and because Fire does not contain a *Gunwall* analysis, we choose to conduct

our own *Gunwall* analysis.

*Factors 1, 2, and 5: Textual language of state constitutional right to an impartial

jury, and textual and structural differences in that language compared to the parallel

federal provision*: Article I, section 22 provides in relevant part: "In criminal prosecutions

the accused shall have the right to . . . trial by an impartial jury . . . ." The Sixth

Amendment to the United States Constitution provides: "In all criminal prosecutions, the

accused shall enjoy the right to . . . trial, by an impartial jury . . . ." The relevant language is almost identical in text and structure.

*Factor 3: State constitutional history*: Article I, section 22 was taken from the federal constitution. *Rivera*, 108 Wn. App. at 648 n.2.

*Factor 4: Preexisting state law*: Munzanreder notes that Washington common law had always insisted that a jury be impartial. *See State v. Stiltner*, 80 Wn.2d 47, 491 P.2d 1043 (1971). This observation does not convince us of any difference between the relevant language in the state and federal constitutional provisions—both explicitly emphasize the importance of an impartial jury.

*Factor 6: Particular state or local concern*: Munzanreder's discussion of this factor, similar to his discussion of most of the other factors, focuses on article I, section 21 instead of article I, section 22. To the extent he repeatedly conflates the two constitutional provisions, we disagree with his analysis. In nearly 100 years, our state has yet to recognize any state or local concern with respect to a defendant's right to an impartial jury that would justify interpreting article I, section 22 differently than how federal courts have interpreted the Sixth Amendment. *See Fire*, 145 Wn.2d at 163.

An analysis of the *Gunwall* factors convinces us that our state constitutional right to an impartial jury should be interpreted as providing the same degree of protection as

the parallel federal constitutional right. We agree with *Rivera*. We similarly hold that article I, section 22's right to an impartial jury does not provide any more protection than the Sixth Amendment.

2.    SUFFICIENCY OF VOIR DIRE PROCESS

Munzanreder contends the voir dire process employed in his case was insufficient. He argues it is difficult for the trial court or jurors to recognize their own bias, and due process requires a more robust process than the one used by the trial court here. He attempts to punctuate his point by showing how the trial court's voir dire process allowed four biased jurors to be empaneled. As further explained below, we disagree with his argument, with his assertion that there were four biased jurors empaneled, and with his blaming the voir dire process for venire juror 51 being empaneled.

Both the United States and Washington State Constitutions provide a right to trial by an impartial jury, which "requires a trial by an unbiased and unprejudiced jury, free of disqualifying jury misconduct." *State v. Boiko*, 138 Wn. App. 256, 260, 156 P.3d 934 (2007); *see* U.S. CONST. amend. VI; CONST. art. I, § 21. RCW 2.36.110 states:

> It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

12

### a.    *Voir dire process*

A trial court has considerable discretion in conducting voir dire. *Lopez-Stayer v.*

*Pitts*, 122 Wn. App. 45, 50, 93 P.3d 904 (2004). Abuse of discretion occurs when a trial

court bases its decision on untenable grounds or untenable reasons. *Id.*

The trial court is best able to ensure that the voir dire process is effective for

seating an impartial jury. *Lopez-Stayer*, 122 Wn. App. at 50-51. "The primary purpose of

voir dire is to give a litigant an opportunity to explore the potential jurors' attitudes in

order to determine whether the jury should be challenged." *Id.* at 51. The test is whether

the court permitted a party to ferret out bias and partiality. *Id.*

Munzanreder argues "[t]he process employed for removing biased jurors violated

[his] state and federal due process rights to a fair trial by an impartial jury." Appellant's

Opening Br. at 1. Munzanreder neither suggests that the trial court used a process that

violated due process nor does he point to a process he requested that the trial court

denied.

The court summoned 243 potential jurors. The parties worked together to craft an

extensive juror questionnaire that satisfied the State, Munzanreder, and the trial court.

The trial court granted several dozen individual interviews in open court outside the

presence of other venire jurors. The trial court was fully involved with the process, and

13

asked questions designed to expose bias and to ensure that jurors would reach a verdict based on the evidence presented at trial and on the court's instructions on the law. Jury selection took over four days. Munzanreder did not request additional peremptory challenges, despite knowing he had that option. Munzanreder simply asserts now that the process was insufficient, although he was heavily involved at trial in developing the process used. Because Munzanreder does not show an abuse of discretion, his appeal on this issue fails.

### b. Specifically challenged jurors

Munzanreder argues the voir dire process used by the trial court was constitutionally deficient. He attempts to punctuate his point by showing that four biased jurors were empaneled.

A party may challenge a juror for cause. CrR 6.4(c); RCW 4.44.170. The trial court is in the best position to determine whether a juror can be fair and impartial because the trial court is able to observe the juror's demeanor and evaluate the juror's answers to determine whether the juror would be fair and impartial. *State v. Birch*, 151 Wn. App. 504, 512, 213 P.3d 63 (2009). For this reason, this court reviews a trial court's denial of a challenge for cause for a manifest abuse of discretion. *Id.*

14

Actual bias supports a challenge for cause. RCW 4.44.170(2). Actual bias means

"the existence of a state of mind on the part of the juror in reference to the action, or to

either party, which satisfies the court that the challenged person cannot try the issue

impartially and without prejudice to the substantial rights of the party challenging." RCW

4.44.170(2). "[E]quivocal answers alone do not require a juror to be removed when

challenged for cause, rather, the question is whether a juror with preconceived ideas can

set them aside." *State v. Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991). A party

claiming actual bias must establish it by proof. *Id.* at 838. To prevail, a party must show

more than a possibility of prejudice. *Id.* at 840. "[T]he law presumes each juror sworn is

impartial and qualified to sit on a particular case, otherwise he would have been

challenged for 'cause.'" *State v. Latham*, 30 Wn. App. 776, 781, 638 P.2d 592 (1981),

*aff'd*, 100 Wn.2d 59, 667 P.2d 56 (1983).

i.     *Venire juror 19*

During individual voir dire, the trial court elicited statements from venire juror 19

that he was familiar with the case from the media and tended to believe the media. He

stated he had listened to the media and had formed an opinion. However, the trial court

questioned him on whether he would afford Munzanreder the presumption of innocence,

15

make a decision based on the evidence presented at trial, and follow all instructions.

Venire juror 19 responded that he would. Munzanreder did not challenge venire juror 19:

> THE COURT: Any motions?
> [THE STATE]: Not from the state.
> [MR. MUNZANREDER]: Not from the defense, your Honor.

VRP (Jury Selection) at 810.

Munzanreder extensively argues that jurors are unable to recognize their own bias. That may be so. But here, not even Munzanreder recognized any bias. Based on the record, there is no support for Munzanreder's argument that venire juror 19 was biased.

### ii. *Venire juror 33*

Munzanreder argues that venire juror 33 suffered from actual bias because she read in the newspaper that Munzanreder had hired a coworker to commit the crime, and she tended to believe the newspaper. Venire juror 33 also said she had not formed an opinion in the case. Munzanreder did not believe venire juror 33 was biased, as evidenced by the fact he did not challenge venire juror 33 for cause. There is no support for Munzanreder's argument, here on appeal, that venire juror 33 was biased.

### iii.    *Venire juror 51*

In the questionnaire, venire juror 51 answered he had formed an opinion about the case through media. The trial court questioned venire juror 51 whether he could set his opinion aside and decide the case based only on the evidence presented at trial. He said he could.

Munzanreder then asked additional questions. Venire juror 51 said he had formed the opinion that Munzanreder was guilty and it would be up to the evidence to change his mind. Munzanreder discussed the presumption of innocence. He asked venire juror 51 if he agreed with the presumption and, if so, whether he could provide the presumption of innocence to him. Venire juror 51 answered he could, and that he believed he could be fair and unbiased in this case.

The trial court then asked venire juror 51 if he could be fair and unbiased in the case. He said he could. After venire juror 51 left, Munzanreder challenged him for cause. The trial court denied the challenge, stating:

> I'm going to deny the motion. I think he was very candid and very open. . . .
> I thought he was very candid about his concern for the system, that he would be fair, unbiased [sic]. . . . He would set aside what he heard in the newspaper and listen to the evidence that was presented in court.
> I do not understand, if you're hearing him, his comment, the answer that he had made, that he had, in fact, prejudged anything. I did not understand that to be the case. Motion denied.

17

VRP (Jury Selection) at 787-88.

           iv.     *Venire juror 59*

Venire juror 59 also expressed familiarity with media coverage of the case. But he said he could set aside his opinions, be fair and impartial, and follow the trial court's instructions. Munzanreder did not believe venire juror 59 was biased as evidenced by the fact he did not challenge him for cause. There is no support for Munzanreder's argument, here on appeal, that venire juror 59 was biased.

The fact that venire jurors 19, 33, 51, and 59 were empaneled does not support Munzanreder's argument that the trial court's voir dire process was deficient. To the contrary. The fact that defense counsel did not challenge venire jurors 19, 33, and 59 for cause refutes Munzanreder's argument that the trial court's voir dire process was deficient.

        c.     *Even if the trial court erred in denying any one of Munzanreder's challenges for cause, his constitutional right to an impartial jury was not violated*

As previously mentioned, Munzanreder had six peremptory challenges, and there were only two venire jurors he had unsuccessfully challenged for cause who could have been empaneled as jurors. Therefore, Munzanreder was able to have a jury empaneled composed entirely of jurors he did not consider biased.

18

"[W]here a defendant exercises a peremptory challenge after the court denies a defense motion to excuse the juror for cause, any potential violation of the defendant's Sixth Amendment right to an impartial jury is cured." *State v. Yates*, 161 Wn.2d 714, 746, 168 P.3d 359 (2007) (citing *United States v. Martinez-Salazar*, 528 U.S. 304, 316-17, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000)); *see also State v. Roberts*, 142 Wn.2d 471, 518, 14 P.3d 717 (2000). In addition, the fact that a defendant was required to use all of his peremptory challenges to remove jurors who should have been removed for cause does not violate the state or federal constitutions. *Fire*, 145 Wn.2d at 164-65.

Here, Munzanreder used one challenge to remove venire juror 49, but elected not use any of his several other peremptory challenges to remove venire juror 51. He also elected not to request additional peremptory challenges. If the trial court erred in denying Munzanreder's for cause challenge of venire juror 51, because Munzanreder elected not to remove venire juror 51 with his allotted peremptory challenges or by requesting additional challenges, Munzanreder

19

waived that error.[2] *Dean v. Grp. Health Coop. of Puget Sound*, 62 Wn. App. 829, 836, 816 P.2d 757 (1991).

### 3. CHANGE OF VENUE MOTION

Munzanreder contends the trial court abused its discretion when it denied his motion for a change of venue. He primarily argues the pretrial media publicity was overwhelmingly inflammatory, which prejudiced the jury pool against him. We disagree that the trial court abused its discretion.

To prevail on a change of venue motion, the defendant need only show a probability of unfairness or prejudice. *Sheppard v. Maxwell*, 384 U.S. 333, 351-52, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *State v. Rupe*, 108 Wn.2d 734, 750, 743 P.2d 210 (1987). In *Patton v. Yount*, 467 U.S. 1025, 1039, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984), the United States Supreme Court addressed the problem of pervasive media publicity arising in sensational criminal cases. The *Patton* Court recognized that adverse pretrial publicity can create a presumption in a community that jurors' claims that they could be impartial should not be believed; and partly for this reason, the appellate court

---

[2] Munzanreder did not assign error to the trial court's denial of his motion to strike venire juror 51 for cause. To the extent that Munzanreder did not waive his challenge as explained above, he has waived his argument by not assigning error to the trial court's denial. *Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 214, 848 P.2d 1258 (1993).

examines the totality of the circumstances in deciding whether such a presumption arises. *Id.* at 1031. Nevertheless, the trial court's findings of impartiality are reversible only for manifest error. *Id.*; *Rupe*, 108 Wn.2d at 751.

Similarly, this court reviews a trial court's denial of a change of venue motion for an abuse of discretion. *Rupe*, 108 Wn.2d at 750. A trial court abuses its discretion when it bases its decision on untenable grounds or for untenable reasons. *Kappelman v. Lutz*, 167 Wn.2d 1, 6, 217 P.3d 286 (2009). We are reluctant to overturn a trial court's discretionary decision to deny a change of venue motion. *Rupe*, 108 Wn.2d at 750.

The following nonexclusive factors aid our review of whether a trial court abused its discretion in denying a change of venue motion:

> "(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn."

*Id.* at 752 (quoting *State v. Rupe*, 101 Wn.2d 664, 675, 683 P.2d 571 (1984)).

21

        *a.*     *First group of factors: The degree the potential jurors were impacted by adverse media coverage*

Our review of the record establishes there was substantial and meaningful adverse pretrial publicity soon after the shooting. The local paper and television stations ran stories that all but declared Munzanreder guilty. Several people used the media's Facebook page to make comments showing their disdain for Munzanreder. The comments reflected an attitude that Munzanreder was guilty, wondered why the public had to provide him an attorney, and called for severe punishment. The Munzanreder story was one of Yakima County's most significant news stories of 2013. Munzanreder accurately notes that 82 percent of the venire panel had heard of the case and, of these, 12 venire jurors concluded he was guilty. These factors weigh heavily in favor of granting Munzanreder's motion to change venue.

        *b.*     *Second group of factors: The process used by the trial court to seat an impartial jury*

It is irrelevant that the great majority of potential jurors have heard of the case. *State v. Jackson*, 150 Wn.2d 251, 269, 76 P.3d 217 (2003). The test is whether a "juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961).

22

But simply because a juror claims he can lay aside a prior opinion and render a verdict based on the evidence does not make it so. "[J]urors may not fully appreciate or accurately state the nature of their own biases." *State v. Saintcalle*, 178 Wn.2d 34, 78, 309 P.3d 326 (2013) (Gonzalez, J., concurring). "The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental process of the average man." *Irvin*, 366 U.S. at 727.

> How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matters designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception.

*Id.* at 729-30 (Frankfurter, J., concurring).

Therefore, "[g]iven the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." *Sheppard*, 384 U.S. at 362. If a case has received substantial media attention, one strong measure would be for the trial court to grant an accused's request for additional peremptory challenges. Another strong measure would be for the trial court to more readily grant a defendant's for cause challenge to those venire jurors who admit they once held an adverse opinion of

23

the accused. In sensational cases with extensive media coverage, a trial court would be justified in providing *both* of these strong measures.

The trial court's process allowed the parties to identify possibly biased jurors and then fully question them. We note that there were only four venire jurors whom Munzanreder unsuccessfully challenged for cause. Of these four, the trial court eventually removed one, and another sat outside the group of potential jurors or alternate jurors who could have been empaneled. This left only two venire jurors whom Munzanreder had unsuccessfully challenged for cause. Because Munzanreder could have used two of his six peremptory challenges to remove both suspect jurors, the trial court's process for seating a jury was very satisfactory. These factors weigh heavily in favor of denying Munzanreder's motion to change venue.

    *c.*    *Third group of factors: Intangibles that impact our analysis*

The State charged Munzanreder with first degree murder. This most serious charge impacts our analysis and requires that we be highly confident that the empaneled jury was impartial. Also, the jury pool was chosen from Yakima County. Munzanreder estimated there were 150,000 potential jurors in this geographical area. This relatively large base of potential jurors helps assure that jurors can be found who lack bias.

24

Although the initial venire pool provided substantial challenges because of the trial court's careful process for selecting a jury, we are highly confident that 11 of the 12 empaneled jurors were impartial. If venire juror 51 was biased, Munzanreder had the opportunity to remove him. Munzanreder elected not to use any of his peremptory challenges to remove venire juror 51, and he did not request additional peremptory challenges. These two facts strongly suggest that even Munzanreder believed the empaneled jury was fair and impartial. We conclude the trial court did not abuse its discretion when it denied Munzanreder's motion to change venue.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions as provided in RCW 2.06.040.

4.    JURY INSTRUCTION ON LESSER INCLUDED OFFENSE

Munzanreder next contends that an error related to accomplice liability in the to-convict instruction for the lesser included offense of second degree murder requires reversal. The State responds that Munzanreder waived or invited the alleged error by agreeing to the instruction. Munzanreder denies he agreed to the instruction.

### a. Invited error

Under the doctrine of invited error, even where constitutional rights are involved, this court will not review jury instructions when the defendant has proposed an instruction or agreed to its wording. *State v. Winings*, 126 Wn. App. 75, 89, 107 P.3d 141 (2005).

Here, Munzanreder objected to the proposed instruction only on the basis that the evidence did not warrant an instruction on the lesser included offense. Minutes later when asked by the trial court whether he had a chance to critique the State's proposed instructions, Munzanreder responded: "I didn't see any difference between theirs and mine, and I thought mine were pretty damn good. It would be like throwing a rock at a glass house to suggest that the [S]tate's needed fixing." 12 VRP (Jury Trial) at 2931. These comments show that Munzanreder did not see any errors in the instruction, which is different than agreeing to the wording of a specific instruction. We conclude that Munzanreder did not invite error in a manner that would preclude our review of the instruction.

### b. To-convict instructional error

A party generally waives an issue on appeal when he or she fails to raise the issue at trial. RAP 2.5(a). An exception exists for a claim of manifest error affecting a

constitutional right. RAP 2.5(a)(3). This exception applies if (1) the alleged error is truly

of a constitutional magnitude, and (2) the error is manifest. *State v. Kalebaugh*, 183

Wn.2d 578, 583, 355 P.3d 253 (2015).

### 1. *Constitutional magnitude*

Munzanreder meets the first part of the RAP 2.5(a)(3) test. Article I, section 3 of

the Washington Constitution states: "No person shall be deprived of life, liberty, or

property, without due process of law." The right to due process of law includes the right

to a fair trial. *State v. Davis*, 141 Wn.2d 798, 824-25, 10 P.3d 977 (2000). A defendant

does not receive a fair trial if "the jury must guess at the meaning of an essential element

of a crime or if the jury might assume that an essential element need not be proved."

*State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997).

### 2. *Manifest error*

An error is manifest if it had practical and identifiable consequences at trial.

*Kalebaugh*, 183 Wn.2d at 584. An error is practical and identifiable if, at the time the

error was made, the "trial court should have known" of the error. *Id.* Any error in this

instruction would not be manifest.

Munzanreder's specific objection to the lesser included instruction is quite

nuanced: the court's to-convict instruction on first degree murder included an element

27

that the victim died as a result of the defendant's *and/or* an accomplice's acts; whereas, the trial court's to-convict instruction on second degree murder included an element that the victim died as a result of the defendant's *or* an accomplice's acts. Such a nuanced argument fails the requirement that the error be manifest.

In addition, any error would have no consequence at trial. The State correctly points out, if there was instructional error, the error was harmless because the jury would not have considered the second degree to-convict instruction after it agreed on the first degree murder charge. The jury was instructed to reach second degree murder only if it could not agree on first degree murder, and we presume jurors follow the trial court's instructions. *Spivey v. City of Bellevue*, 187 Wn.2d 716, 737, 389 P.3d 504 (2017). We agree with the State that any purported error could not have affected trial. We will not review the alleged error because it is not manifest.

5.   CLERICAL ERRORS

Munzanreder next contends there are two clerical errors in the judgment and sentence. He first argues the jury returned a guilty verdict on February 4, 2015, not February 2, 2015, as stated in the judgment and sentence. He next argues the special findings section in the judgment and sentence refers to his firearm enhancement but cites the sentencing grid statute. The State concedes these errors should be corrected, and

28

No. 33328-1-III
*State v. Munzanreder*

argues that Munzanreder need not be present in court for such technical corrections. We accept the State's concessions and agree that Munzanreder's presence is not necessary when the trial court makes these two technical corrections to the judgment and sentence.

6.    APPELLATE COSTS

Munzanreder asks this court to decline to impose appellate costs in the event the State substantially prevails. During oral argument, the State agreed. Wash. Court of Appeals oral argument, *State v. Munzanreder*, No. 33328-1-III (Mar. 23, 2017), at 15 min., 23 sec. through 15 min., 30 sec. (*audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org). We therefore decline to award the State appellate costs.

Affirmed but remanded to correct two clerical errors.

Lawrence-Berrey, J.

WE CONCUR:

Fearing, C.J.

Pennell, J.

29