THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 82428-7-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| JONNIE L. LAY, | |
| Appellant. | |

ANDRUS, C.J. — In 2018, a jury convicted Jonnie Lay of second degree rape for an offense he committed in 2007. On appeal, he argues that his conviction violated the statute of limitations in effect at the time he was charged, that the delay in his prosecution violated his due process rights, and that a nearly all white jury venire violated his right to an impartial jury under the state and federal constitutions. We reject these arguments and affirm Lay's conviction.

FACTS

On March 14, 2007, T.R. left the Belltown homeless shelter, Angeline's, and went for a walk down Second Avenue. Near the intersection with Pike Street, a car pulled up onto the sidewalk, blocking her path. Johnnie Lay jumped out of the car, grabbed T.R., and threw her into the back seat. Lay got into the passenger

Citations and pin cites are based on the Westlaw online version of the cited material.

seat and the driver, who was never identified, drove away. Over the course of the next several hours, Lay repeatedly raped T.R. in the car and at an unidentified wooded area, at times while threatening T.R. with a screwdriver. At one point, Lay dropped an identification badge and T.R. saw the name "John Lay."

Eventually, Lay and the driver threw T.R. out of the car in Belltown near the Sculpture Garden and she returned to Angeline's where she reported the rape and called the police. Seattle Police Officer Kurt Alstrin responded to the call and took T.R.'s statement. Officer Alstrin then took T.R. to Harborview Medical Center where she spoke with a sexual assault nurse examiner and a hospital social worker about the incident. She underwent a full sexual assault examination, which included the collection of several swabs for deoxyribonucleic acid (DNA) testing. A nurse observed a laceration near T.R.'s vagina as well as bruising on her thigh.

The Seattle Police Department (SPD) assigned the case to Detective Roger Ishimitsu. Detective Ishimitsu reviewed the police report and the Harborview medical records and telephoned T.R. at the number she had provided. They arranged for a formal interview on March 28, but T.R. did not show up. Detective Ishimitsu followed up with a voicemail and a letter, but T.R. never responded. By that point, T.R. had left Angeline's and was living at the YWCA.

Detective Ishimitsu searched SPD's database for "John Lay," the name T.R. reported to have seen on the dropped identification badge, and found several different individuals with similar names. He was unable to make a positive identification of the suspect. Because Detective Ishimitsu did not have a responsive victim and was unable to proceed with the case, he followed

department policy in effect at the time and did not send the sexual assault kit for testing and inactivated the case.

In 2015, the Washington Legislature passed a law, now codified as RCW 5.70.040, requiring the testing of all sexual assault kits held in law enforcement custody. SPD sent T.R.'s sexual assault kit to the state crime lab for testing in June 2016. The police received the results in March 2018. DNA found on the swabs in the sexual assault kit matched Lay, whose DNA was already in the FBI's Combined DNA Index System from prior convictions.

On March 8, 2018, SPD reassigned the case to Detective Shawn Martinell. Martinell located T.R., now living in a Belltown apartment, and arranged to interview her. He completed his investigation and submitted it to the prosecutor's office for possible charges by March 23, 2018. Lay, living in Illinois at the time, traveled to Seattle voluntarily for his arraignment. Police then obtained a DNA sample from him, which confirmed the DNA match. The State charged Lay with first degree rape on May 21, 2018.

At that time, the statute of limitations for first and second degree rape was 10 years "from the date of commission or one year from the date on which the identity of the suspect is conclusively established by deoxyribonucleic acid testing or by photograph . . . , whichever is later." Former RCW 9A.04.080(3) (2006).[1] Because the State filed the charge more than 10 years after the date of the alleged offense, Lay moved to dismiss the charge. The trial court denied the motion,

---

[1] The current statute of limitations for first and second degree rape is 20 years. RCW 9A.04.080(1)(b).

finding that SPD did not identify Lay by DNA or photograph until March 2018, two months before the State filed charges.

Lay's first trial ended in a mistrial with a hung jury. The State then amended the charge to second degree rape. At the second trial, Lay testified in his own defense. He admitted having sex with T.R., but testified that T.R. had approached him and offered to have sex with him in exchange for crack cocaine. He testified that the two wandered around downtown Seattle before finding a secluded location to have consensual sex and smoke crack together. Lay denied that any violence occurred and claimed the encounter ended when he left the area on a bus.

A jury convicted Lay of second degree rape. The court imposed a sentence within the standard range. Lay appeals.

ANALYSIS

Statute of Limitations

Lay first argues the trial court erred in denying his motion to dismiss the charge for violation of the statute of limitations. We disagree.

When the facts are not in dispute, alleged violations of the statute of limitations are questions of law we review de novo. State v. Peltier, 181 Wn.2d 290, 294, 332 P.3d 457 (2014). There are no disputed facts regarding the statute of limitations in this case. The State filed charges against Lay over 11 years after he committed the crime. At the time, the statute of limitations for second degree rape was 10 years. But the trigger date for the commencement of this 10-year period was not the date of the crime. In 2006, the legislature amended the statute of limitations for any sex offenses under RCW 9.94A.030 to start the clock "from

the date of commission or one year from the date on which the identity of the suspect is conclusively established by deoxyribonucleic acid testing or by photograph as defined in RCW 9.68A.011, whichever is later." Former RCW 9A.04.080(3) (LAWS OF 2006 ch. 132, § 1). Then, as now, a "sex offense" under RCW 9.94A.030 included both first and second degree rape. Former RCW 9.94A.030(41); RCW 9A.44.045 (first degree rape); RCW 9A.44.050 (second degree rape).

The parties dispute the meaning of the phrase "the date on which the identity of the suspect is conclusively established by deoxyribonucleic acid testing or by photograph." Lay argues that the statute of limitations ran when T.R. reported the rape to police because police "could have 'conclusively established' his identity" with the results of the sexual assault kit and the information T.R. gave police regarding the name she saw on his identification badge. We reject this interpretation as contrary to the plain language of former RCW 9A.04.080(3) (2006).

The interpretation of a statute is a question of law that we review de novo. State v. Gonzalez, 168 Wn.2d 256, 263, 226 P.3d 131 (2010). Our goal in interpreting a statute is to carry out the legislature's intent. Id. at 263. We must avoid an interpretation that would produce an unlikely, absurd, or strained result. State v. Fjermestad, 114 Wn.2d 828, 835, 791 P.2d 897 (1990). We first examine the plain language of the statute. Gonzalez, 168 Wn.2d at 263. If the meaning of a statute is plain on its face, we give effect to the plain meaning as an expression of legislative intent. State v. J.M., 144 Wn.2d 472, 480, 28 P.3d 720 (2001).

- 5 -

This court has previously held that "the identity of a suspect is not 'conclusively established' until DNA testing matches the DNA profile of an unknown suspect to the DNA profile of a known suspect." State v. McConnell, 178 Wn. App. 592, 315 P.3d 586 (2013), review denied, 180 Wn.2d 1015 (2014). Here, the DNA testing did not match Lay to the DNA profile from the sexual assault kit until March 2018. The statute of limitations began to run at that point.

Lay asks us to overrule McConnell, arguing the holding in that case "contravenes a principal purpose of the statute of limitations, which is to encourage prompt investigations. It allows the government to avoid the statute of limitations by delaying the testing of a DNA sample indefinitely." But even if we agreed with this reasoning, the public policy implications of the statute of limitations for rape is a question for the legislature, not this court. The plain language of the statute is unambiguous; the limitations period runs when DNA evidence is conclusively matched to a suspect, not when that evidence "could have been" matched.

We reach the same conclusion regarding the exception for photographic identification. Lay argues that the police had access to his photograph because he was a registered sex offender and the police "could have shown the photograph to [T.R.]" after she provided the name "John Lay." But, there is no dispute that T.R. did not positively identify Lay from a photograph, as required for the statute of limitations to begin to run. We therefore conclude the statute of limitations did not commence until Lay's DNA was matched to the sexual assault kit in March of 2018. The trial court did not err in denying Lay's motion to dismiss the charge against him on statute of limitations grounds.

Due Process

Lay next argues that, even if the State filed charges within the statute of limitations, the delay in bringing charges violated his due process rights. We again disagree.

Whether preaccusatorial delay violates due process is a question of law we review de novo. State v. Oppelt, 172 Wn.2d 285, 290, 257 P.3d 653 (2011). Preaccusatorial delay violates due process if prosecution of the case "violat[es] fundamental conceptions of justice." Id. at 295.

This court employs a three-part test in order to determine whether preaccusatorial delay violates due process. First, the defendant must show actual prejudice. Id. A defendant is not required to show bad faith, but "[w]here the State's reason for delay is mere negligence, establishing a due process violation requires greater prejudice to the defendant than cases of intentional bad faith delay." Id. at 296. "If the defendant establishes prejudice, the burden shifts to the State to show the reasons for the delay." McConnell, 178 Wn. App. at 606 (citing Oppelt, 172 Wn.2d at 295). The court then balances the State's justification against the prejudice to the defendant and determines "whether fundamental conceptions of justice would be violated by allowing prosecution." Oppelt, 172 Wn.2d at 295.

The Ninth Circuit has characterized the defendant's burden in a claim of prosecutorial delay as "heavy" and rarely met. United States v. Huntley, 976 F.2d 1287, 1290 (9th Cir. 1992). "Prejudice, whenever it is alleged, must be specially demonstrated and cannot be based upon speculation." State v. Haga, 8 Wn. App.

481, 489, 507 P.2d 159 (1973) (citing United States v. Marion, 404 U.S. 307, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971)). The mere assertion that a missing witness might have been useful does not establish actual prejudice. United States v. Mays, 549 F.2d 670, 677 (9th Cir.1977). Nor does the assertion that "witnesses' memories may have faded with the passage of time." Prantil v. California, 843 F.2d 314, 318 (9th Cir.1988).

Lay argues that the delay in his prosecution was the result of mere negligence, not bad faith. Therefore, Lay must make a heightened showing of prejudice to obtain relief under a negligent delay theory. Oppelt, 172 Wn.2d at 292-93.

We find the analysis in McConnell instructive. There, the defendant argued he suffered actual prejudice from a 12-year delay in filing charges because, by that point, his mother was no longer alive to testify and the State had destroyed much of the physical evidence. 178 Wn. App. at 606. The court concluded that McConnell failed to demonstrate actual prejudice because he did not identify what his mother would have said if called to testify or explain how the physical evidence would have aided his defense. Id. at 607.

In this case, Lay similarly argues that he suffered actual prejudice because the passage of time prohibited him from developing his defense of consent. He claimed that T.R. approached him and offered sex in exchange for crack cocaine. He testified that because he did not have any drugs or any money with which to purchase them, he and T.R. walked around downtown Seattle in search of a dealer who would give Lay drugs for which he could pay later. While walking around, Lay

claimed he found an envelope on the ground containing $500, and shortly afterwards found a dealer from whom he purchased $200 worth of crack. He testified that the two then found a spot out of public view near the sports stadiums where they smoked the crack and had consensual sex.

Lay argues that T.R. lied about having been raped and the State's delay in bringing a rape charge made it impossible for him to recover possible security camera footage of the downtown area where she alleged she was abducted. He contends that had he been immediately charged, he could have found this security footage to prove no abduction by car occurred in the location she claimed. Lay submitted a declaration from an investigator with the public defender's office who stated that in 2007 there were surveillance cameras on the southwest and northwest corners of the intersection of Second Avenue and Pike Street. He testified that when he visited the businesses at that location in January 2019, there were cameras at the intersection but the businesses that had been present in 2007 were no longer there. From this testimony, Lay contends that surveillance camera footage to prove T.R. lied about the abduction was lost.

This argument, however, is speculative and insufficient to carry a claim of unconstitutional preaccusatorial delay. Lay has no evidence that any exculpatory security camera footage ever existed. Even if there are security cameras at the intersection, there is no way to know that the cameras were directed toward the location T.R. identified as the place of her abduction.

Even less convincing is Lay's argument that, had the State charged him sooner, he could have found witnesses in the area of the alleged abduction to rebut

T.R.'s account of the rape. Despite testifying that he and T.R. interacted with a number of other individuals on the day in question, Lay has not identified any witness who could have corroborated his story. His mere assertion that such evidence might have existed is insufficient. Based on this record, Lay has failed to meet his burden of establishing actual prejudice.

<u>Right to an Impartial Jury</u>

Lay finally argues that we should reverse his conviction because the underrepresentation of African Americans in his jury venire violated his right to an impartial jury under both the state and federal constitutions. We reject this argument as well.

During jury selection before his second trial, Lay orally moved for a new venire because only two potential jurors in the venire of 147 identified themselves as Black or African American. Lay, who is Black, argued that the jury pool underrepresented the Black population of King County in violation of his constitutional right to an impartial jury. But when he moved to strike the jury panel below, defense counsel admitted "I don't know the county's approach to sending out . . . Jury Summons" and "I don't have evidence—to say that the . . . jury summonsing process is explicitly bias." He nevertheless argued that the result of the process in Lay's case was a disparity between the racial make-up of King County and the venire assigned to Lay's trial. He presented no statistical data to support this allegation.

The court denied the motion because Lay could not identify a deficiency in the county's jury summons process. The trial court opined that Lay was "asking

[the court] to redo the same thing we've already done . . . [a]nd hoping for a different result." The court stated the juror selection process was "race neutral," but indicated that if Lay found evidence indicating otherwise, the court was willing to hear it. Lay never brought such evidence before the trial court. At the conclusion of voir dire, the parties selected a panel of 14 jurors, including two alternates. None of the jurors was Black.

A defendant has a right under the Sixth and Fourteenth Amendments and article I, § 22 of the Washington constitution to be tried by a jury that is representative of the community. Taylor v. Louisiana, 419 U.S. 522, 527, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); State v. Hilliard, 89 Wn.2d 430, 440, 573 P.2d 22 (1977). A defendant is not, however, entitled to exact cross representation in the jury pool and the jury selected for the defendant's trial need not be of any particular composition. Hilliard, 89 Wn.2d at 442. A jury selection process is adequate as long as it "may be fairly said that the jury lists or panels are representative of the community." Taylor, 419 U.S. at 538.

To establish a prima facie case of a violation of his right to a fair cross section of the community, Lay must establish "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to systemic exclusion of the group from the jury selection process." State v. Cienfuegos, 144 Wn.2d 222, 231-32, 25 P.3d 1058 (2001) (quoting Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d

- 11 -

579 (1979)). If a defendant establishes all three elements, he has shown a prima facie case of a Sixth Amendment violation and the State must justify the infringement "by showing attainment of a fair cross section to be incompatible with a significant state interest." Duren, 439 U.S. at 364.

In this case, the trial court found that Lay failed to demonstrate the second and third elements of the Duren test and denied Lay's motion to strike the venire. We review a trial court's ruling on challenges to the venire process for abuse of discretion. State v. Tingdale, 117 Wn.2d 595, 600, 817 P.2d 850 (1991). A challenge to the jury panel will be sustained only if there is a demonstrated material departure from the procedures provided by law. State v. Roberts, 142 Wn.2d 471, 519, 14 P.3d 713 (2012).

The trial court did not abuse its discretion in denying Lay's motion to strike the venire. Lay did not challenge the method by which King County Superior Court generates its master list of prospective jurors. Nor did he argue that the court departed from the statutory procedures for creating this random list. And there is no evidence it did so.

Chapter 2.36 RCW guides the assembly of Washington jury panels. Superior courts derive master jury source lists from all registered voters and all "licensed drivers and identicard holders" residing in each county. RCW 2.36.054(1). Potential jurors are selected at random. RCW 2.36.065. The court then sends those potential jurors summonses through the mail. RCW 2.36.095. In Hilliard, our Supreme Court held that the statutory method of selecting jurors at random from voter registration lists is the best source of compiling a fair cross-

section of the community. 89 Wn.2d at 440. Since Hilliard, the Washington legislature has revised the methods for compiling jury lists in an effort to make the pool of eligible jurors more inclusive and representative. State v. Lanciloti, 165 Wn.2d 661, 668-69, 201 P.3d 323 (2009). We have no basis to conclude that the method by which King County Superior Court generates its list of prospective jurors violates either the state or federal constitution.

Moreover, Lay provided no evidence to the trial court that King County's jury selection procedure leads to an unfair or unreasonable underrepresentation of Black voters in relation to the numbers of eligible members of that group in the community or that the court systematically excludes Black voters from the jury pool. Lay relied solely on the fact that, in his case, only two of the 147 potential jurors identified as Black or African American. But a mere allegation of underrepresentation in a jury venire does not establish a violation of a defendant's right to an impartial jury. In re Pers. Restraint of Yates, 177 Wn.2d 1, 20, 296 P.3d 872 (2013). For all these reasons, the trial court did not abuse its discretion in denying Lay's motion to strike the venire.

Lay raises two new arguments on appeal. First, Lay contends that by splitting King County into two different jury assignment areas, the court has created jury venires with disparate percentages of Black jurors in relationship to their numbers in the community. He maintains that King County Superior Court's adoption of two jury assignment areas, one for residents who live north of Interstate 90 and a second for residents who live south of Interstate 90, perpetuates historic racial disparities, the result of which is an unfair representation of the Black

population in Seattle jury pools.[2]  Lay points to census data indicating that the Black population in Seattle, Kent and Renton is 9.2 percent, 12.4 percent, and 12.7 percent, respectively.  He also relies on the academic research of Peter Collins and Brooke Miller Gialopsos who recently published the results of juror surveys which they undertook to determine whether there are gender, racial or ethnic, or sexual orientation disparities within jury pools in Washington state courts.  See Collins & Gialopsos, "Answering the Call: An Analysis of Jury Pool Representation in Washington State," 22 Criminology, Criminal Justice Law & Society 1 (2021).  Based on the survey responses from jurors, Collins and Gialopsos found that there is, in general, an underrepresentation of Black jurors at both the Seattle and Kent courthouses.  Id. at 10.

But neither the demographic data Lay submits nor the survey results discussed in "Answering the Call" attribute this underrepresentation to the King County Superior Court jury assignment area boundaries or any other exclusionary aspect of the jury selection process.  In fact, Lay has made no attempt to demonstrate disproportionality under any of the recognized statistical methods that courts have employed.  See United States v. Hernandez-Estrada, 749 F.3d 1154,

---

[2] Our Supreme Court upheld the split between judicial divisions in King County as constitutional under both article I, section 22 of the State Constitution and the Sixth Amendment.  State v. Lanciloti, 165 Wn.2d 661, 671-72, 201 P.3d 323 (2009).  In that case, a Black defendant challenged the constitutionality of RCW 2.36.055 which permitted superior courts with more than one courthouse to divide its jury source list in a way to make it easier for jurors to travel to the courthouse nearest to their residence.  Id. at 671.  With the amendment to RCW 2.36.055, King County Superior Court passed amendments to Local CrR 5.1 and Local General Rule 18, dividing its jury source list into Seattle and Kent jury assignment areas.  The boundary of the two jury assignment areas is Interstate 90.  LCrR 5.1(2)(A), (B).  The purpose of moving away from a county-wide unitary jury pool system was to reduce racial disparities in jury service.  Lanciloti, 165 Wn.2d at 664, n.1.  The Supreme Court held that RCW 2.36.055 did not violate the Sixth Amendment or article I, § 22's right to an impartial jury.  Id. at 671-72.

1160 (9th Cir.), cert. denied, 574 U.S. 1029 (2014) (discussing strengths and weaknesses of various analytical methods for evaluating fair cross-section cases). A showing of underrepresentation alone does not establish systematic exclusion of a group in the jury selection process. Duren, 439 U.S. at 366. Instead, a defendant must show that any underrepresentation is inherent in the jury selection process. Id. The resulting underrepresentation must be "due to the system by which juries were selected." Id. at 367. Lay produced no evidence to establish a nexus between the jury assignment area system and the underrepresentation of people who identify as Black or African American in jury venires.[3]

Second, Lay asks this court to jettison the nexus requirement of the Duren test and hold that article I, §§ 21 and 22—in combination—confer broader protections of the right to a jury drawn from a fair cross section of the community than the Sixth Amendment. He argues that "this Court should find under the Washington Constitution, unlike the Sixth Amendment, evidence of underrepresentation of a distinctive group in the jury pool sufficiently establishes a fair cross section claim." In State v. Munzanreder, 199 Wn. App. 162, 174, 398 P.3d 1160, review denied, 189 Wn.2d 1027 (2017), Division Three of this court

---

[3] This court has repeatedly rejected challenges to the jury venire process on appeal where the defendant failed to make an evidentiary showing at trial that a distinctive minority group had been systematically excluded from the jury pool. See State v. Severns, no. 81668-3-I, slip op. at *4-5 (Wash. Ct. App. Dec. 6, 2021)[3] (a single instance of an unrepresentative jury pool is "anecdotal" and "does not prove that jury venires in King County are disproportionately lacking in African Americans relative to the population of African Americans in the county itself"); State v. Clark, 167 Wn. App. 667, 674-76, 274 P.3d 1058 (2012) ("A systematic failure, in the absence of evidence that normal selection procedures were not followed, would require evidence that a cognizable group routinely was excluded from jury service."); State v. Singleton, 9 Wn. App. 399, 406-07, 512 P.2d 1119 (1973) (trial court properly rejected defendant's challenge to the jury panel where no evidentiary showing was made in support of his argument that the jury selection process excludes large portions of poor and minority segments of King County).

rejected this argument. A panel of this division recently certified this question to our Supreme Court. See State v. Paul Rivers, no. 81216-5, Order of Certification (May 11, 2022). A commissioner of that court accepted certification and transferred the case to the Supreme Court for a determination on the merits. See State v. Paul Rivers, no. 100922-4, Ruling Accepting Certification (May 12, 2022).

Despite the pendency of this constitutional issue in the Supreme Court, we conclude we need not reach it here because even if we were to adopt the test Lay advances, he failed to present sufficient evidence to establish a prima facie case under that lesser standard. Based on the record before us, we cannot find for the first time on appeal that an underrepresentation of people who identify as Black or African American in jury venires at the Seattle courthouse is a per se violation of the state constitution's right to an impartial jury.[4]

Because the data Lay presents is so scant and the analysis so superficial, we conclude that he has not established a prima facie case of a constitutional violation under either the Sixth Amendment or article I, §§ 21 and 22.

### Statement of Additional Grounds

Finally, Lay raises several additional arguments in his statement of additional grounds. We reject each of these arguments.

Lay argues that the State committed prosecutorial misconduct. To establish prosecutorial misconduct, the defendant must establish both improper conduct by

---

[4] We further note that Lay had the ability to ask the trial court to transfer venue to the Kent assignment area if he believed he would receive a more representative jury venire in that courthouse. King County Superior Court Local Criminal Rule (KCLCrR) 5.1(d)(3)(E) states that "The Court on its own motion or on the motion of a party may assign or transfer cases to another case assignment area in the county whenever required for the just and efficient administration of justice in King County." Lay never moved to change venue.

the prosecutor and prejudicial effect. State v. Furman, 122 Wn.2d 440, 455, 858 P.2d 1092 (1993). Prejudice is established only if there is a substantial likelihood the instances of misconduct affected the jury's verdict. State v. Evans, 96 Wn.2d 1, 5, 633 P.2d 83 (1981). Lay first contends the prosecutor committed misconduct by releasing his criminal history to the press. However, there is no evidence in the record to substantiate this claim. Lay's allegation that his criminal record can be found online is wholly insufficient and does not establish prosecutorial misconduct.

Lay also argues that the prosecutor committed misconduct by characterizing his crime as "brutal" and alleges that the prosecutor called him an "animal" in front of the jury. The latter never happened. It was T.R. who described Lay as an animal. And although the prosecutor did describe the crime as "brutal," our Supreme Court has held that a prosecutor's repeated characterization of a crime as "brutal" does not constitute prosecutorial misconduct. State v. Pirtle, 127 Wn.2d 628, 673-74, 904 P.2d 245 (1995). Lay argues that the prosecutor's use of the term had racist connotations, citing the fact that African American men have a long history of being characterized as "brutes" and "savages." But the prosecutor never called Lay a "brute." She stated that Lay "brutally raped" T.R., an accurate factual description of the crime as it was described by the victim. Lay has also failed to make any showing that the prosecutor's use of the term had any effect on the jury's verdict.

Next, Lay argues that Seattle police did not read him his Miranda[5] warning upon his arrest. Miranda warnings protect a defendant's constitutional right not to

---

[5] Miranada v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

- 17 -

make incriminating confessions or admissions to police while in the coercive environment of police custody. State v. Harris, 106 Wn.2d 784, 789, 725 P.2d 975 (1986), cert. denied, 480 U.S. 940, 107 S. Ct. 1592, 94 L. Ed. 2d 781 (1987). Without a Miranda warning, a suspect's statements during custodial interrogation are presumed involuntary. State v. Sargent, 111 Wn.2d 641, 647-48, 762, P.2d 1127 (1988). In this case, the State did not offer any of Lay's custodial statements as evidence. Even if the State did fail to give a Miranda warning, this failure did not affect Lay's conviction.

Finally, Lay argues he received ineffective assistance of counsel for his trial counsel's failure to meet with Lay for strategic discussions, failure to give Lay full discovery, and failure to question T.R. on her drug use.

To demonstrate ineffective assistance of counsel,

> [f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Lay cannot meet this standard. Even if we conclude that defense counsel made the errors Lay claims and that these errors rose to the level of deficient performance, he has not made any showing of prejudice. Lay does not explain how the outcome of trial would have changed if he had had strategic meetings with counsel and full access to discovery material. Moreover, T.R. freely admitted to using crack cocaine on the day she was raped. Lay does not explain how further

- 18 -

questioning on that subject would have helped his case.

Affirmed.

_Andrus, C.J._

WE CONCUR:

_Coburn, J._        _Mann, J._