
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68852-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| MICHAEL WILLIAM MCCONNELL, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 30, 2013 |

SCHINDLER, J. — The 10-year statute of limitations for rape in the first degree begins on the date of commission of the crime or one year from the date "on which the identity of the suspect is conclusively established by deoxyribonucleic acid [(DNA)] testing . . . , whichever is later."[1] Michael William McConnell appeals his conviction for rape in the first degree arguing the State did not charge him within the 10-year statute of limitations. In the alternative, McConnell claims the delay in filing the charges violated due process. Because DNA testing did not conclusively establish the identity of McConnell until 2011 and the delay in filing the charges did not violate his due process rights, we affirm.

---

[1] RCW 9A.04.080(1)(b)(iii)(A), (3).

FACTS

At around 8:30 a.m. on June 24, 1998, E.C. went to her portable classroom at Discovery Elementary School to prepare for the upcoming summer school session. Of the five portable classrooms located at the north end of the school campus, E.C.'s portable classroom was the farthest away to the east. E.C. locked the door to the portable but opened the southeast window. Over the course of the morning, E.C. left the classroom several times. Each time E.C. left, she locked the door but left the window open.

E.C. locked the door after returning to the classroom after lunch. While she was sitting at her desk, a male voice said, " 'Okay, here we go. Get down on the floor.' " E.C. turned around and saw a man dressed in black. The man was wearing a black knit cap with his face partially covered and only his eyes and nose visible, a black long-sleeved shirt, black pants, black gloves, and black lace-up boots. The man pointed a large-caliber revolver at E.C. and told her to lay face-down on the floor and demanded money. E.C. told the man where to find her purse and heard him going through the purse.

The man told E.C. not to move, scream, or look at him or he would " 'blow [her] fucking head off.' " The man then knelt down beside her and put his hand between her legs. The man told E.C. to remove her pants and underwear. The man held the gun to her neck with one hand while he digitally raped her with his other hand. The man then moved behind E.C and raped her anally. When E.C. screamed in pain, the man put the gun to "her head and cocked it, reminding her of the consequences." After anally raping E.C., the man ordered her to roll onto her back and vaginally raped her. The man then

2

got dressed and asked E.C. where the telephone was located. The man tore the telephone cord and wires from the wall and told E.C. "that he would shoot her if he saw her outside before he was gone." Approximately five minutes after the man left, E.C. ran to an adjacent portable classroom and called 911.

Snohomish County and Everett Police Department officers responded to the 911 call. E.C. " 'was crying and her whole body was trembling. . . . [S]he collapsed on the floor sobbing and trembling.' " E.C. gave the police officers a brief summary of what happened before going to the hospital. Officers searched the classroom and surrounding area. The officers observed scuff marks on the exterior wall below the southeast window and found a black sweater south of the school. A K-9 dog tracked a scent from the portable classroom to a grassy area nearby where the K-9 officer observed bicycle tracks. The officers took plaster casts of the bicycle tracks. A latent fingerprint analysis of the telephone found no fingerprints of value.

The hospital performed a sexual assault examination of E.C. Before meeting with E.C. the next day, officers collected E.C.'s clothing and the sexual assault evidence from the hospital.

E.C. told the officers that she locked the door to the classroom but left the southeast window open. E.C. said that after returning from lunch, she was sitting at her desk looking out the north window and did not hear the man climb inside. E.C. described the man who raped her as a white male, between 18 and 24 years old, and possibly blond. E.C. believed the man was between 5 feet 10 inches and 6 feet tall and weighed 170 pounds. The Snohomish County Sheriff's Office issued a news release with a description of the suspect and a composite drawing based on E.C.'s description.

3

On September 10, 1998, Washington State Patrol Crime Laboratory (WSPCL) forensic scientist Brian Smelser obtained semen samples from the swabs and underwear taken from E.C.[2] Using restriction fragment length polymorphism (RFLP) testing, WSPCL forensic scientist Jodi Sass identified the DNA of two male contributors. One contributor was identified as E.C.'s spouse. The other contributor was an unknown male. The DNA profile of the unknown male did not match any DNA profile in the WSPCL convicted felon database.

In 1998, the Federal Bureau of Investigation (FBI) started maintaining a national DNA index system, the "Combined DNA Index System" (CODIS). The FBI uses short tandem repeat (STR) DNA testing for the CODIS database. In 2000, the WSPCL transitioned from using RFLP to STR DNA testing. When the WSPCL transitioned from RFLP to STR testing, 957 unknown DNA profiles in the WSPCL database were "classified as closed work requests."

On October 12, 2000, the court sentenced Michael William McConnell for the crime of residential burglary. On December 5, 2000, the court sentenced McConnell for committing the crime of residential burglary with a deadly weapon. As a result of the felony convictions, McConnell was ordered to submit to DNA testing.

In 2003, the lead detective in the 1998 rape investigation, Snohomish County Detective George Wilkins, authorized the release and destruction of the evidence from the unsolved 1998 rape case. According to Detective Wilkins, "[T]here was a big push at the Sheriff's office to help the property room clear out evidence" and he mistakenly believed the statute of limitations for the 1998 rape had expired. Detective Wilkins said

---

[2] DNA extraction involves both removing cells from the objects to which they are attached (clothing, blood samples, etc.) and removing the DNA from inside the cell. State v. Cauthron, 120 Wn.2d 879, 893, 846 P.2d 502 (1993).

he did not contact the prosecutor's office to confirm whether the statute of limitations had expired before authorizing destruction of the evidence retained at the Snohomish County Sheriff's Office. The destroyed evidence included the black sweater found near the school, photographs of the classroom, photographs of the abrasions on E.C.'s neck, photographs of the area surrounding the school, the plaster casts of the bicycle tracks, the telephone the suspect had pulled out of the wall, and E.C.'s clothing.

In June 2010, Snohomish County Detective James Scharf was assigned to the cold case unit and was investigating a 1995 homicide. The 1995 homicide occurred in the same area as the 1998 rape and involved a suspect who rode a bicycle. Detective Scharf had worked on the 1998 rape investigation. Detective Scharf said that because the case "stuck out in my mind," he decided to look into the case again "to determine if the DNA profile was ever compared in CODIS." Detective Scharf contacted the WSPCL and learned "there was plenty of DNA extracted from the victim's panties that could be tested again using the current [STR] process." Detective Scharf requested the WSPCL conduct STR testing.

On January 7, 2011, WSPCL forensic scientist Jodi Sass contacted Detective Scharf about the results from the STR analysis on a sample previously extracted from the victim's underwear. After identifying the major male DNA profile, Sass searched the CODIS database. The DNA profile matched the DNA from "Michael W. McConnell, date of birth 12-18-80." Sass asked Detective Scharf to obtain "a known sample directly" from McConnell to confirm the match. Sass told Detective Scharf that "there is still plenty of DNA extract to use for further testing."

5

Detective Scharf obtained a copy of McConnell's 1998 driver's license. The 1998 driver's license described McConnell as a white male with blond hair, 5 feet 8 inches tall, and 163 pounds. Detective Scharf determined that based on McConnell's date of birth, "McConnell would have been 17 years and 6 months old at the time this rape occurred."

On February 28, 2011, the court issued a search warrant to obtain DNA from McConnell. On March 2, Detective Scharf and Detective Patrick VanderWeyst took saliva swabs from McConnell for DNA testing. During an interview with the detectives, McConnell said that in 1998 he lived with his parents, two brothers, and a sister in a house located eight-tenths of a mile from Discovery Elementary School. McConnell said he "had a bunch of bikes."

On March 17, Sass completed the DNA analysis of the saliva swabs from McConnell. Sass confirmed that the major male DNA from E.C.'s underwear "matches the DNA typing profile obtained from the reference sample of Michael McConnell." The WSPCL forensic report states the "estimated probability of selecting an unrelated individual at random from the U.S. population with a matching profile is 1 in 19 quadrillion."

On March 25, 2011, the State charged McConnell with the 1998 rape in the first degree of E.C. McConnell filed a motion to dismiss on the grounds that the State did not charge him within the 10-year statute of limitations under RCW 9A.04.080(1)(b)(iii)(A) and (3). The 10-year statute of limitations for rape in the first degree runs from the date of commission of the crime or one year from "the date on

6

which the identity of the suspect is conclusively established" by DNA testing.[3] McConnell argued his identity was conclusively established in 1998 when the WSPCL obtained a unique genetic profile using RFLP analysis. In the alternative, McConnell asserted the delay in filing the charges violated due process. In support of the motion to dismiss, McConnell submitted court records showing the Snohomish County Prosecutor's Office had previously charged unknown suspects using a DNA profile rather than by name.

The State argued the identity of McConnell was not conclusively established until the WSPCL conducted STR testing and was able to match the DNA profile from the 1998 rape to the DNA obtained from McConnell. The State submitted the declaration of WSPCL DNA manager Gary Shutler, the 2011 WSPCL forensic report, and the 1998 WSPCL forensic report. The 1998 WSPCL forensic report states that "[n]o matches were found between the DNA profile of the semen donor and the DNA profiles in the data bank."

Shutler states that after the FBI began using STR testing for the CODIS database, the WSPCL began transitioning from RFLP to STR testing, and an increased and ongoing demand for DNA testing and analysis resulted in a backlog. Shutler explains that "[d]ue to the limitation of resources[,] no systematic process was ever employed to evaluate old RFLP data base cases for suitability of performing STR analysis." But Shutler states that if an agency working on a cold case submitted a request for analysis, the remaining DNA extract sample would be reanalyzed using STR testing.

---

[3] RCW 9A.04.080(1)(b)(iii)(A), (3).

The State also presented legislative history related to the 2006 amendment to the statute of limitations for rape in the first degree stating that the 10-year limitations period runs from the date the identity of the suspect is conclusively established by DNA testing.[4] According to the House Bill Report for Substitute Senate Bill 5042, the Washington Association of Criminal Defense Lawyers (WACDL) and the Washington Defenders Association (WDA) expressed concerns about whether a preliminary match from a DNA database would be sufficient to "conclusively" establish a suspect's identity. H.B. REP. on Substitute S.B. 5042, at 3-4, 59th Leg., Reg. Sess. (Wash. 2005). WACDL and WDA suggested adding language to expressly state "that the statute of limitations is triggered when a DNA profile is matched with a DNA profile from any certified database." H.B. REP. on Substitute S.B. 5042, at 4.[5]

The court denied the motion to dismiss. The court entered findings of fact and conclusions of law and incorporated its oral ruling. The court concluded the State filed the charge of rape in the first degree within the statute of limitations. The court ruled that the statute of limitations "did not begin until the suspect's identity was 'conclusively established,' which occurred on or after December 13, 2010 when the Defendant's DNA profile was matched with the suspect's DNA profile" in the CODIS database and

---

[4] LAWS OF 2006, ch. 132, § 1.

[5] The House Bill Report for Substitute Senate Bill 5042 states, in pertinent part:
Defense attorneys understand and generally agree that the advances in [DNA] technology should be fully utilized, including in cold cases, to advance the cause of justice in the court system - the victims deserve no less. . . . [T]here are concerns with the triggering language in that it requires "conclusive" establishment of a suspect's identification. What about the situation where the lab finds a "preliminary" or "tentative" match by running it through a single database? This preliminary identification would probably trigger an investigation by police but it would not trigger the statute of limitations. . . . It is not clear from the bill who is responsible for reaching the conclusion that a suspect has been "conclusively" identified. One suggestion . . . is to amend this section to state that the statute of limitations is triggered when a DNA profile is matched with a DNA profile from any certified database.
H.B. REP. on Substitute S.B. 5042, at 3-4.

confirmed by the subsequent DNA analysis. The court rejected McConnell's

interpretation of the statute:

> In this statute, the critical word that needs to be focused in on is the term "conclusively." If the argument of the defense is accurate, there would have been no need for the legislature to insert the term "conclusively" in the statute.
>
> Each DNA profile has a unique genetic sequence of DNA. If the intent for the statute of limitations was to run when a person had been identified by their DNA profile and the unique genetic makeup of the profiles, the word "conclusively" would be superfluous. The intent behind adding the term "conclusively" meant more than having a unique DNA profile. The identity of the suspect was conclusively established when either there was the actual comparison between the two samples, or, when there was the match in the CODIS system, because, under either scenario in this case, the case was filed timely.

The court also rejected McConnell's argument that prosecutorial delay violated

due process:

> The passage of time that occurred in this case - between entry of the Defendant's DNA profile into CODIS using STR testing methods in late 2000 or early 2001, and resubmission of the rape suspect's DNA profile into CODIS using STR testing methods in January, 2011 (as opposed to the RFLP method originally used in 1998) - does not amount to "delay" in the sense that word ("delay") is used to evaluate governmental mismanagement or negligence in the context of preaccusatorial delay claims. Given that no "delay" occurred, actual prejudice, reason for delay, and a balancing thereof are not addressed.

McConnell agreed to a stipulated bench trial. The parties submitted over 200

pages of documentary evidence, including the police reports from the 1998 rape

investigation, transcripts of the 1998 interview with E.C., the 2011 interview with

McConnell, and the1998 and 2011 WSPCL forensic reports.[6] The court found

McConnell guilty of rape in the first degree. At sentencing, E.C. told the court, "To this

---

[6] The court also considered "all previously admitted evidence and exhibits admitted during pre-trial proceedings."

9

day, I have no idea who he is, how he found me, or why he did this to me. He is a complete stranger to me." The court sentenced McConnell to 161 months.

ANALYSIS

Statute of Limitations

McConnell contends he is entitled to dismissal of the rape in the first degree conviction because the State did not charge him within the 10-year statute of limitations.

RCW 9A.04.080 sets forth the statute of limitations for rape in the first degree. RCW 9A.04.080 states, in pertinent part:

> (1) Prosecutions for criminal offenses shall not be commenced after the periods prescribed in this section.
>
> . . . .
>
> (b) [T]he following offenses shall not be prosecuted more than ten years after their commission:
>
> . . . .
>
> (iii)(A) Violations of RCW 9A.44.040 or 9A.44.050 if the rape is reported to a law enforcement agency within one year of its commission.
>
> . . . .
>
> (3) In any prosecution for a sex offense as defined in RCW 9.94A.030, <u>the periods of limitation</u> prescribed in subsection (1) of this section <u>run from the date of commission or one year from the date on which the identity of the suspect is conclusively established by [DNA] testing</u> or by photograph as defined in RCW 9.68A.011, <u>whichever is later.</u>[7]

The parties dispute the meaning of the phrase, "date on which the identity of the suspect is conclusively established by [DNA] testing." RCW 9A.04.080(3). McConnell argues that the phrase, "date on which the identity of the suspect is conclusively

---

[7] (Emphasis added.) Between 1998 and 2013, the legislature amended RCW 9A.04.080 several times. See LAWS OF 2006, ch. 132, § 1; LAWS OF 2009, ch. 53, § 1; LAWS OF 2009, ch. 61, § 1; LAWS OF 2012, ch. 105, § 1; LAWS OF 2013, ch. 17, § 1. In 2006, the legislature amended the statute to state that the 10-year statute of limitations runs from the date of the commission of the act or from the date a defendant's identity is conclusively established by DNA testing, whichever is later. LAWS OF 2006, ch. 132, § 1. Because the amendments do not affect our analysis here, we cite to the current version of the statute. See also State v. Hodgson, 108 Wn.2d 662, 666-67, 740 P.2d 848 (1987) ("When the Legislature extends a criminal statute of limitation, the new period of limitation applies to offenses not already time barred when the new enactment was adopted and became effective.").

established by [DNA] testing," means the date when the unique DNA profile of a rape suspect is identified, not when the State matches the unknown DNA profile to a particular person. McConnell argues his identity was conclusively established when the 1998 forensic report identified a unique DNA profile. The State argues that the words "conclusively established" mean more than obtaining a unique DNA profile from an unknown suspect. The State asserts that the identity of an unknown rape suspect is not conclusively established until the DNA profile of an unknown suspect is matched to the DNA profile of a known suspect. The State argues McConnell's identity was not conclusively established until the DNA analysis in 2011 identified McConnell through CODIS and the DNA test of the swab from McConnell confirmed his DNA matched the profile of the unknown 1998 rape suspect.

The interpretation of a statute is a question of law that we review de novo. State v. Gonzalez, 168 Wn.2d 256, 263, 226 P.3d 131 (2010). Our goal in interpreting a statute is to carry out the legislature's intent. Gonzalez, 168 Wn.2d at 263. We must avoid an interpretation that would produce an unlikely, absurd, or strained result. State v. Fjermestad, 114 Wn.2d 828, 835, 791 P.2d 897 (1990). We first examine the plain language of the statute. Gonzalez, 168 Wn.2d at 263. We determine the plain meaning "from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." State v. Engel, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009).

We interpret statutes to give effect to all language used, rendering no portion meaningless or superfluous. City of Seattle v. State, 136 Wn.2d 693, 698, 965 P.2d 619 (1998). If the meaning of a statute is plain on its face, we give effect to the plain meaning as an expression of legislative intent. State v. J.M., 144 Wn.2d 472, 480, 28 P.3d 720 (2001).

Because the statute does not define "conclusively established," we look to the ordinary meaning of the words. "When a statutory term is undefined, the words of a statute are given their ordinary meaning, and the court may look to a dictionary for such meaning." Gonzalez, 168 Wn.2d at 263. "Conclusive" means "forming an end or termination . . . : putting an end to debate or question [especially] by reason of irrefutability : involving a conclusion or decision." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 471 (2002). "Establish" means "to make firm or stable : . . . to settle or fix after consideration . . . : to prove or make acceptable beyond a reasonable doubt." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 778.

To determine whether a match conclusively establishes the identity of a rape suspect, a forensic scientist must compare an unknown DNA profile with a known DNA profile. See State v. Gore, 143 Wn.2d 288, 302, 21 P.3d 262 (2001) ("DNA typing methods are designed to extract portions of DNA molecules and determine whether the genetic profile resulting from a forensic sample matches that of a suspect."), overruled on other grounds by State v. Hughes, 154 Wn.2d 118, 110 P.3d 192 (2005); State v. Copeland, 130 Wn.2d 244, 262, 922 P.2d 1304 (1995) (once a suspect's blood sample is found to " 'match' " a forensic sample, scientists calculate the likelihood of a random match). Accordingly, the identification of a DNA profile from an unknown suspect does

not "put[] an end to debate or question" or "involve[] a conclusion or decision," or "settle" or "prove" a defendant's identity. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 471, 778. We conclude that under the plain language of the statute, the identity of a suspect is not "conclusively established" until DNA testing matches the DNA profile of an unknown suspect to the DNA profile of a known suspect.

Preaccusatorial Delay

In the alternative, McConnell contends he is entitled to reversal because preaccusatorial delay violated due process. Whether preaccusatorial delay violates due process is a question of law we review de novo. State v. Oppelt, 172 Wn.2d 285, 290, 257 P.3d 653 (2011). Preaccusatorial delay violates due process if prosecution of the case "violat[es] fundamental conceptions of justice." Oppelt, 172 Wn.2d at 295.

The court uses a three-part test to determine whether preaccusatorial delay violates due process. First, the defendant must specifically show actual prejudice from the delay. Oppelt, 172 Wn.2d at 295. A defendant is not required to show bad faith; "negligent delay can violate due process." Oppelt, 172 Wn.2d at 292. However, "[w]here the State's reason for delay is mere negligence, establishing a due process violation requires greater prejudice to the defendant than cases of intentional bad faith delay." Oppelt, 172 Wn.2d at 296. If the defendant establishes prejudice, the burden shifts to the State to show the reasons for the delay. Oppelt, 172 Wn.2d at 295. The court then examines the entire record to weigh the reasons for the delay against the prejudice and "determine whether fundamental conceptions of justice would be violated by allowing prosecution." Oppelt, 172 Wn.2d at 295.

13

McConnell claims the delay resulted in prejudice because his mother is no longer alive to testify and the State destroyed all the evidence. McConnell also argues the 12-year delay in filing the charges is more prejudicial than the six-year delay in Oppelt.

In Oppelt, the minor victim told her great-grandmother that her stepfather molested her. Oppelt, 172 Wn.2d at 287. The great-grandmother gave the victim lotion to apply to her vagina. Oppelt, 172 Wn.2d at 287. A nurse examined the victim and observed redness and swelling of the genitalia. Oppelt, 172 Wn.2d at 287. The great-grandmother reported the abuse to police a few days later but "[t]he report never made it to the prosecutor's office." Oppelt, 172 Wn.2d at 288. The State did not charge Oppelt with child molestation until six years later. Oppelt, 172 Wn.2d at 287-88. At trial, the great-grandmother could not recall what type of lotion she gave the victim. Oppelt, 172 Wn.2d at 296.

The Supreme Court held that the delay was the result of the State's negligence but did not violate Oppelt's due process rights. Oppelt, 172 Wn.2d at 296. The court concluded that the great-grandmother's memory loss caused only "very slight prejudice" because the defendant was not precluded from arguing that the lotion caused the redness and swelling. Oppelt, 172 Wn.2d at 296.

Here, McConnell does not show actual prejudice from the delay in filing charges. McConnell does not identify what his mother's testimony would have shown. While McConnell argues his mother was a potential alibi or fact witness, he does not identify what his mother would have said if called to testify. Nor does McConnell explain why the other members of his family, his father, brothers, or sister, could not provide the same or similar testimony.

14

McConnell also claims he was prejudiced by the destruction of evidence, including the black sweater believed to have been worn by the suspect, plaster casts of the suspect's bicycle tracks, and photographs taken of the crime scene and the victim's injuries. But McConnell does not identify exactly how the destroyed evidence resulted in actual prejudice. Further, there is no dispute that the destruction of the evidence was unrelated to the delay in filing charges.

In addition, McConnell asserts that because E.C.'s clothing was destroyed, he was unable to extract an independent sample for DNA testing. Contrary to his assertion, the record establishes there was "plenty of DNA extract[]" to use for further testing.[8]

Without citation to authority, McConnell also contends that the State should have compared the unknown sample to the DNA database and retested the DNA using STR analysis before 2010.[9] But "investigative and administrative delays in the processing of a case are fundamentally unlike delay undertaken by the [State] solely 'to gain tactical advantage over the accused.' " State v. Alvin, 109 Wn.2d 602, 606, 746 P.2d 807 (1987)[10] (quoting United States v. Lovasco, 431 U.S. 783, 795, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977)). Here, the record shows that the delay in retesting the DNA from the unsolved 1998 rape case was not undertaken to gain a tactical advantage. Due to limited resources, the WSPCL retested DNA profiles from the RFLP database only when a specific request was made. We conclude the record establishes the delay in

---

[8] McConnell also cites Howell v. Barker, 904 F.2d 889 (4th Cir. 1990). Howell is distinguishable. In Howell, the State conceded actual prejudice. Howell, 904 F.2d at 895.

[9] McConnell also claims the State should have used the DNA profile from the RFLP testing to charge him as an unknown suspect. But McConnell cites no authority for the proposition that the State should have done so.

[10] (Alteration in original.)

filing the charge of rape in the first degree against McConnell did not violate fundamental conceptions of justice.

We affirm the conviction of rape in the first degree.

WE CONCUR: