# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53308-1-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| DANIEL LUDWIG KEEN, | |
| Respondent. | |

MAXA, J. – The State appeals the trial court's order dismissing with prejudice the second degree rape charge against Daniel Keen because of preaccusatorial delay in violation of due process and governmental mismanagement under CrR 8.3(b). The State charged Keen in 2018 after his DNA sample matched suspect DNA in a sexual assault evidence kit associated with an alleged rape in 2009. Although police interviewed Keen and identified him as a suspect in the case in 2009, the State did not pursue a warrant for his DNA until 2017 and did not file the charge against Keen until a year after obtaining the DNA match results.

We hold that (1) the trial court did not err in dismissing the charge against Keen based on preaccusatorial delay because Keen showed that the delay caused actual prejudice in that he was unable to locate or contact several key witnesses, and (2) the trial court did not err in dismissing the charge against Keen under CrR 8.3(b) because Keen showed that governmental

mismanagement prejudiced his right to a fair trial for the same reason. Accordingly, we affirm the trial court's order dismissing with prejudice the second degree rape charge against Keen.[1]

FACTS

*Incident and Initial Investigation*

KJM and her roommate Kimberly Woo left the Hub Tavern in Centralia at approximately 2:00 AM on July 4, 2009 with two males who had approached them for a ride. KJM did not know the two men. She stated that she was very intoxicated.

KJM drove the four individuals in her vehicle from the tavern to a Chevron station where they purchased some food. She then decided not to drive further because she was feeling too intoxicated. She got into the backseat of the vehicle with one of the men and passed out. KJM could not remember which man got into the backseat with her. KJM recalled that the man in the backseat with her put his fingers inside her vagina when they arrived at KJM and Woo's house in Chehalis. KJM stated that she then passed out again.

Later inside the house, KJM remembered being on a futon and seeing the man wearing a black hat and white shirt trying to put his penis in her mouth. KJM then passed out again. When she woke up at about noon, her bottom hurt, and she knew something had happened because she felt fluid coming out of her bottom. No one else was in the house, and her cell phone and the keys to her vehicle were missing. Another friend drove KJM to the hospital. A sexual assault examination, including DNA swabs, was conducted by a nurse, Wendy Johnson.

On July 5, KJM reported to the Chehalis Police Department (CPD) that she had been sexually assaulted. Officer Neil Hoium contacted KJM at the hospital emergency room in

---

[1] Keen cross-appeals regarding two of the trial court's findings. Because we affirm, we do not address this cross-appeal.

Centralia where she had gone for a sexual assault examination and evidence collection. KJM relayed the events recited above to Hoium.

After retrieving the sexual assault evidence kit from Johnson, Hoium returned the kit to the police station for processing. That evening, KJM contacted the CPD again to report that Woo had stolen her purse.

Sergeant Rick McNamara then took over the case. On July 9, McNamara directed KJM to call detective Rick Silva and to give him a statement about the rape case. KJM called Silva and was very upset and yelling, mainly concerned with whether Woo would be arrested for stealing her purse.

The CPD also interviewed Woo. Woo stated that she did not know the two men who came home with her and KJM, but that she saw one of them grope KJM. Woo thought the man's name was Kyle. She stated that KJM was very drunk on the way home from the Chevron station, vomiting and then passing out in the backseat. When they got to the house, Woo was unable to wake KJM to come inside. Woo left KJM in the car and went in the house with Kyle. Woo stated that she listened to music with Kyle in KJM's bedroom. Woo slept in her bed with Kyle on the other side of her bed. At about 5:00 AM on July 4, KJM came into the house to sleep on the sofa. Kyle was still in bed with Woo the next morning but apparently left while she was in the shower.

McNamara obtained security video from the Chevron station for the night of the incident. On the video, he was able to observe the two men with KJM and Woo. One man was wearing a baseball hat and a white t-shirt and the other had a mohawk haircut. The surveillance video also showed that a female store clerk went out to KJM's vehicle with Woo and talked to KJM. The man with a mohawk was visible inside the vehicle. Woo, KJM, and the clerk then entered the

store, followed by the man with a mohawk. However, the CPD did not obtain any formal statements from anyone at the Chevron.

On July 23, Keen, the man in the video with the mohawk, came into the CPD station on an unrelated matter. McNamara interviewed him. Keen stated that he had gone to the Hub Tavern with a friend named Kyle Teagle and that the two of them went home with KJM and Woo. Keen stated he "messed around" with KJM but did not recall having sex with her. Clerk's Papers (CP) at 32. He admitted to penetrating her but stated that everything they did was consensual. When KJM started vomiting and passed out, he called a friend to pick him up and left the house. Keen declined to provide a voluntary DNA sample.

McNamara attempted to contact Teagle at his residence but learned that he was working in Utah. On August 3, McNamara took Teagle's statement over the telephone. Teagle stated that he went inside the house with Woo while Keen stayed in the vehicle with KJM. Keen eventually texted him to tell him he had left. Teagle denied touching either Woo or KJM in a sexual way and denied having sex with either of them. He did not know if Keen had sex with either woman or how long Keen remained in the vehicle with KJM. He said KJM was quite drunk and was sleeping on the way to the house.

Teagle agreed to provide a DNA sample and asked if he could do so from Utah, but McNamara told him that he would prefer to take the sample in Chehalis. McNamara kept in touch with Teagle throughout August to determine when Teagle would return to Washington to provide the sample, but by September McNamara had lost contact with Teagle.

McNamara obtained DNA samples from KJM and her boyfriend. In March 2010, the results from the sexual assault evidence kit showed the presence of semen but excluded KJM's

4

boyfriend as the source. Keen and Teagle then became the primary suspects of the investigation. However, there was no follow up.

McNamara's last involvement in the case was on March 31, 2010, when he discovered that Teagle was residing in Hawaii. The case then became inactive. McNamara ultimately did not obtain a DNA sample from either Teagle or Keen and did not pursue a warrant for their DNA. Nothing more was done on the case until 2017.

*Reopened Investigation*

In July 2017, the CPD began looking at the case again. In late August, the CPD contacted Teagle, who was then living in Wyoming. Teagle voluntarily provided a DNA sample in Wyoming, but his sample did not match the male DNA from KJM's sexual assault evidence kit. The CPD then obtained a warrant to obtain DNA samples from Keen. The results from those samples came back in late November 2017 and showed a match.

The State contacted KJM and confirmed that she still wanted the case prosecuted. The State did not charge Keen at that time.

Almost a year later, in November 2018, the State charged Keen with one count of second degree rape. Trial ultimately was scheduled for March 4, 2019 and the time to trial deadline was March 18.

*Keen's Motion to Dismiss*

In February 2019, Keen moved to dismiss the charge against him for preaccusatorial delay in violation of his due process rights and for governmental mismanagement under CrR 8.3(b). He argued that the State's negligent delay before filing the charge against him prejudiced his ability to conduct a meaningful investigation in his own defense.

5

At the hearing on the motion, Keen presented testimony from Steven Aust, a private investigator he had retained to conduct an investigation into his defense. Aust testified that he had attempted to locate the witnesses in the case that were either in contact with Keen or present on the night of the incident.

Aust attempted to contact Woo and Teagle but was unsuccessful. When he contacted KJM, she refused to speak to him. Aust was unable to contact any employees or patrons of the tavern that would have been present on the night of the incident. And he could not locate the Chevron clerk shown on the surveillance video interacting with KJM, Woo, and Keen; any neighbors who might have observed the four arriving home; or Johnson, the nurse who conducted KJM's sexual assault examination and collected DNA swabs for the sexual assault evidence kit. Aust also was unable to contact detective Silva, who spoke with KJM, because Silva had died.

Sergeant McNamara also testified at the hearing. He stated that the delay in the investigation was not strategic or intentional, but that he set the case aside when he was unable to locate Teagle, then the primary suspect, or obtain a DNA sample from him. He acknowledged that he should have sought a warrant to obtain Keen's DNA in 2009 when Keen refused to give a sample voluntarily.

The trial court granted Keen's motion, dismissing the second degree rape charge with prejudice because of both preaccusatorial delay in violation of due process and governmental mismanagement under CrR 8.3(b). The court entered detailed findings of fact and conclusions of law. The court entered conclusions of law stating that the State's delay had prejudiced Keen because the ability to locate Woo and Teagle, witnesses at the Chevron, and the nurse who completed the sexual assault evidence kit was significantly compromised. The court also

concluded that the cumulative effect of this loss of evidence constituted actual and significant prejudice.

The State appeals the trial court's dismissal with prejudice of the second degree rape charge against Keen.

## ANALYSIS

A.    PREACCUSATORIAL DELAY VIOLATING DUE PROCESS

The State argues that the trial court erred in dismissing the charge against Keen based on a violation of his right to due process because Keen failed to establish that he suffered actual prejudice from the preaccusatorial delay.  We disagree.

1.    Legal Principles

"A court will dismiss a prosecution for preaccusatorial delay if the State's intentional or negligent delay violates a defendant's due process rights."  *State v. Maynard*, 183 Wn.2d 253, 259, 351 P.3d 159 (2015).  We use a three-pronged test to determine whether preaccusatorial delay violated a defendant's due process rights:

> (1) the defendant must show he or she was actually prejudiced by the delay; (2) if the defendant shows actual prejudice, the court must determine the reasons for the delay; and (3) the court must weigh the reasons for delay and the prejudice to determine whether fundamental conceptions of justice would be violated by allowing the prosecution.

*Id.* (citing *State v. Oppelt*, 172 Wn.2d 285, 295, 257 P.3d 653 (2011)).  Greater prejudice must be shown if the government conduct is negligent rather than intentional.  *Oppelt*, 172 Wn.2d at 293.

Whether preaccusatorial delay violates due process is a question of law that we review de novo.  *Id.* at 290.  "[W]e examine the entire record to determine prejudice and to balance the delay against the prejudice."  *Id.*

2.    Trial Court's Findings of Fact

Initially, the State argues that substantial evidence did not support the trial court's findings of fact 1.6, 1.13, 1.23, 1.29, and 1.30.  We review a trial court's ruling to determine whether substantial evidence supports the contested findings of fact and whether the findings of fact support the conclusions of law.  *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014).  We treat findings of fact supported by substantial evidence and unchallenged findings of fact as verities on appeal.  *Id.* at 106.

a.    Finding of Fact 1.6

Finding of fact 1.6 stated, "The Chehalis Police Department . . . interviewed [KJM] multiple times, including her primary initial interview and a later contact with then Detective Rick Silva who died years later but years before this case was charged."  CP at 76.  The State contends that this finding is inaccurate because it suggests that KJM's initial interview and later contact with the CPD was through Silva, who in reality spoke to KJM only once.

But contrary to the State's assertion, finding of fact 1.6 does not state that Silva conducted KJM's initial interview, only that he had "later contact" with her.  CP at 76.  We conclude that substantial evidence supports finding of fact 1.6.

b.    Finding of Fact 1.13

Finding of fact 1.13 stated, "The CPD wanted to obtain a DNA sample from Kyle Teagle as their primary suspect, but they were unsuccessful in doing so as he had left the state after being interviewed due to reasons unrelated to the investigation."  CP at 77.  The State challenges this finding because it implies that Teagle was in Washington when he gave his interview to the CPD because Teagle was never in Washington at any point the CPD contacted him regarding the investigation.

McNamara took Teagle's statement over the telephone from Utah. To the extent that finding of fact 1.13 implies that Teagle was in Washington when the CPD first interviewed him, we conclude that substantial evidence does not support that finding. However, this finding is immaterial to any issue on appeal and does not affect any of the challenged conclusions of law. Therefore, we conclude that this error was harmless.

   c.    Finding of Fact 1.23

Finding of fact 1.23 stated,

> Between November 27 and December 29, 2017, the Prosecutor and the CPD had communication where the Prosecutor requested the CPD to locate and contact the alleged victim and see if she still wanted the case prosecuted. This was accomplished and the case was sent for charging at the end of 2017.

CP at 78. The State argues that this finding is inaccurate because after the CPD and the prosecutor agreed on December 29, 2017 that KJM still wanted the case prosecuted, the incident report documenting these communications was not printed until January 5, 2018.

The State appears to contend that the incident report's January 2018 printing date means that the case was in fact sent for charging at the beginning of 2018, not at the end of 2017. But the State points to no evidence in the record linking the date the incident report was printed with the date of its submission to the prosecutor's office. We conclude that the State's challenge to finding of fact 1.23 fails.

   d.    Finding of Fact 1.29

Finding of fact 1.29 stated,

> On January 9, 2019, defense investigator Steve Aust began his investigation in an effort to locate critical witnesses and evidence in the case necessary to the defense, and, if he could not find such witnesses or evidence, to produce a report regarding his conclusions and explanation as a former law enforcement officer of 20 years as to why the defense would be prejudiced.

CP at 79. The State contends this finding suggests that all the witnesses Aust attempted to locate were critical and over-exaggerates the importance of these witnesses.

But contrary to the State's assertion, finding of fact 1.29 does not state that *all* the witnesses Aust attempted to locate were critical to the defense. Instead, the finding merely characterizes the nature of Aust's investigation, to locate critical witnesses if possible, without commenting on the quality or relevance of any of the information those witnesses would have provided the defense. We conclude that substantial evidence supports finding of fact 1.29.

> e. Finding of Fact 1.30

Finding of fact 1.30 stated,

> During the pendency of the case, defense counsel Shane O'Rourke was in communication with the State discussing the issues including issues related to the location of critical witnesses. During the pendency of the case, the State did not locate Kyle Teagle or Wendy Johnson. The State, through law enforcement, served Kimberly Woo with a subpoena, but could never physically locate her or contact her by phone.

CP at 79. The State challenges the finding that it could not physically locate Woo.

Aust tried to contact both Woo and her father via telephone but was unable to reach either of them. At the hearing on the motion to dismiss 10 days before the scheduled trial date, the State told the court that Woo had been served with a subpoena and that the State had discovered she was living locally with her father, whose address was known. But the State was still trying to establish contact with Woo at the time of the hearing.

The State argues that service of the subpoena on Woo means that it had knowledge of her physical location. But service of a subpoena for testimony need not be served on the subject personally. *See* CrR 4.8(a)(3). And the record does not contain any evidence that either party had physically located Woo at the time the motion was argued. We conclude that substantial evidence supports the challenged portion of finding of fact 1.30.

3.     Existence of Actual Prejudice

The State argues that the trial court erred in dismissing Keen's case because he failed to establish that the preaccusatorial delay caused him to suffer actual prejudice.  We disagree.

The State challenges conclusions of law 1.2 and 1.4 containing the trial court's conclusions regarding the actual prejudice to Keen as a result of the preaccusatorial delay.  We generally review de novo challenges to the trial court's conclusions of law, evaluating whether the findings of fact support the conclusions of law.  *Homan*, 181 Wn.2d at 106.  In addition, as noted above, we review de novo whether preaccusatorial delay caused actual prejudice, reviewing the entire record.  *Oppelt*, 172 Wn.2d at 290.

a.     Conclusion of Law 1.2(a)

Conclusion of law 1.2 stated that the preaccusatorial delay caused actual and significant prejudice to Keen and violated his due process rights in three ways.  The trial court found in conclusion of law 1.2(a) that,

> Kimberly Woo and Kyle Teagle were not located by the State prior to filing this case in court almost a decade after the initial investigation began and their ability to be located and questioned by the defense was significantly compromised by the delay.  Also, their testimony is highly relevant because all four relevant parties provided very different accounts of important details of the evening.

CP at 81.

i.     Prejudice Associated with Woo

The State contends that the record does not support the conclusion that preaccusatorial delay significantly prejudiced the defense's ability to locate and question Woo.  First, the State argues that Aust's attempts to contact Woo were insufficient.  Aust attempted to call Woo's father and Woo's last known number, without success.  However, at the hearing on the motion to dismiss 10 days before trial, the State told the court that it also was still trying to contact Woo.

11

Even if Aust's attempts to contact Woo had been more rigorous, the State also had been unable to establish contact with Woo by the time of the hearing on the motion to dismiss.

Second, the State argues that there was an ability to locate Woo and there was still 24 days from the time of the hearing until the time for trial deadline. At the hearing, the State told the trial court that it had discovered that Woo likely was living with her father at a known address. The State claims that although it appeared that Woo was not prepared to cooperate with the State, her testimony could still have been compelled through a material witness warrant under CrR 4.10. But the State did not inform the trial court that its intention was to seek a material witness warrant for Woo.

The State is correct that there may have been the time and the ability to force Woo's attendance at trial. But the State's argument ignores the fact that Woo was cooperative at the beginning of the investigation, voluntarily giving a statement to the CPD. Woo's refusal to cooperate with anyone almost 10 years later clearly hindered Keen's ability to prepare for trial.

ii. Prejudice Associated with Teagle

The State also contends that the record does not support the conclusion that preaccusatorial delay significantly prejudiced the defense's ability to locate and question Teagle. First, the State argues that Aust's attempts to contact Teagle were insufficient. Aust made two calls to Teagle, leaving one voicemail, but was unable to contact him. However, at the hearing on the motion to dismiss 10 days before trial, the State told the court that it also had been unable to contact Teagle. And the trial court entered an unchallenged finding that the State did not locate Teagle during the pendency of the case. Even if Aust's attempts to contact Teagle had been more rigorous, the State also had been unable to establish contact with Teagle by the time of the hearing on the motion to dismiss.

Second, the State argues that the delay in prosecution did not make Teagle unavailable because he already had been unavailable and elusive since August 2009. But in August 2009, McNamara was able to contact Teagle in Utah and took his statement over the telephone. Teagle agreed to provide a DNA sample in Utah. When the CPD reopened the case in 2017, Teagle voluntarily provided a DNA sample when asked despite the fact that he was then located in Wyoming. Therefore, the record supports the conclusion that Teagle could have been located and would have been cooperative if the State had charged Keen earlier.

Finally, the State does not challenge the trial court's conclusion that the testimony of Woo and Teagle was "highly relevant because all four relevant parties provided very different accounts of important details of the evening." CP at 81.

We conclude that the trial court did not err in entering conclusion of law 1.2(a).

b.     Conclusion of Law 1.2(b)

Conclusion of law 1.2(b) stated that Keen was prejudiced in that "[t]he employees and/or other witnesses at the Chevron that evening were also compromised by the delay and would offer relevant evidence in that they observed the interactions of the relevant parties as well as their respective levels of intoxication." CP at 81. The State does not challenge the trial court's finding that Aust could not locate any Chevron witnesses in 2019.

The State contends that this conclusion is speculative because it is unclear if the witnesses at the Chevron could offer any relevant evidence. But the Chevron surveillance video showed that a female store clerk went out to KJM's vehicle and talked to KJM. Keen was visible on the video inside the vehicle. KJM and the clerk then entered the store, followed by Keen. Because the clerk spoke with KJM in Keen's presence and then returned to the store with

them, it is likely she observed their interactions as well as KJM's level of intoxication. Therefore, the clerk had relevant information about the case.

The State also contends that the inability to obtain the Chevron clerk's statement was not prejudicial because it was undisputed that KJM, Woo, Teagle, and Keen had been drinking and that KJM was very intoxicated. However, KJM's level of intoxication was particularly relevant because the State charged Keen with second degree rape, which requires the defendant to have "engage[d] in sexual intercourse with another person . . . [w]hen the victim is incapable of consent by reason of being physically helpless or mentally incapacitated." RCW 9A.44.050(1)(b). Testimony from a neutral, likely sober witness from the Chevron, who had spoken with and observed KJM, would have been relevant to establishing whether or not KJM was so intoxicated as to be physically or mentally incapable of consent.

We conclude that the trial court did not err in entering conclusion of law 1.2(b).

c.    Conclusion of Law 1.2(c)

Conclusion of law 1.2(c) stated that Keen was prejudiced in that

> Wendy Johnson's location and availability were also compromised irreparably due to the pre-accusatorial delay, and information she would provide in advance of trial and at trial would be relevant beyond merely foundational issues in that she was the only person who interviewed the alleged victim during the rape kit process, she used certain protocols to obtain critical evidence in the case, and she obtained and retained critical evidence in the case.

CP at 81-82.

The State concedes that the delay made finding Johnson difficult. However, the State contends that the unavailability of Johnson prejudiced the prosecution instead of the defense because without Johnson, the State would be unable to introduce the DNA evidence from the sexual assault evidence kit that Johnson collected.

14

But in the trial court the State did not concede that Johnson's unavailability would have precluded introduction of the DNA evidence. The State said that the inability to call Johnson "would *weaken* our way of introducing the evidence, and *it would go to the weight* of that evidence that is introduced." Report of Proceeding at 59 (emphasis added). Even in its appellate brief, the State argues that Johnson's absence *possibly* would preclude introduction of the evidence.

Under ER 901(a), "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." To meet this requirement, the proponent "must make a prima facie showing consisting of proof that is sufficient 'to permit a reasonable juror to find in favor of authenticity or identification.' " *State v. Bashaw*, 169 Wn.2d 133, 140-41, 234 P.3d 195 (2010) (quoting *State v. Payne*, 117 Wn. App. 99, 106, 69 P.3d 889 (2003)), *overruled on other grounds by State v. Nunez*, 174 Wn.2d 707, 285 P.3d 21 (2012). And a trial court's admission of evidence under ER 901(a) is reviewed only for abuse of discretion. *State v. Young*, 192 Wn. App. 850, 854, 369 P.3d 205 (2016).

The absence of Johnson's testimony certainly had the potential to make it more difficult for the State to admit the DNA evidence. But ER 901(a) allows some latitude in establishing the authenticity of proffered evidence. Here, officer Hoium would have been able to identify the sexual assault kit because he picked up the kit from Johnson and brought it to the police station. We are not in a position to conclude that Johnson's testimony was necessarily required to authenticate the DNA evidence. Conversely, if Johnson was available, Keen may have been able to ensure that the DNA evidence would not have been admitted depending on the manner in which it was collected.

In addition, Johnson's testimony may have been relevant to the defense because she interacted with KJM shortly after the incident occurred. As the trial court pointed out, Johnson would have interviewed KJM during the sexual assault examination. But the importance of what KJM may have said to Johnson cannot now be determined because she cannot be located.

We conclude that the trial court did not err in entering conclusion of law 1.2(c).

     d.    Conclusion of Law 1.4

Conclusion of law 1.4 stated, "The cumulative effect of all of the loss of evidence in 1.2 above constitutes actual and significant prejudice." CP at 82. The State argues that because the record does not support the finding of prejudice in conclusions of law 1.2(a), (b), and (c) individually, the cumulative effect also could not be prejudicial. But as discussed above, the trial court did not err in determining that the loss of evidence as described in 1.2(a), (b), and (c) caused Keen prejudice.

Based on our review of the record, the prejudice described in conclusions of law 1.2(a), (b) and (c), considered individually, did not necessarily demonstrate actual prejudice. But we agree with the trial court that the cumulative effect of this loss of evidence was sufficient to establish actual prejudice. Therefore, we conclude that the trial court did not err in entering conclusion of law 1.4.

Because we agree that there was actual prejudice, we conclude that the first prong of the due process analysis was satisfied.

    4.    Reason for Delay

The second prong in the due process analysis is to identify the reasons for the preaccusatorial delay. *Maynard*, 183 Wn.2d at 259. The trial court made the following conclusion of law: "The State and law enforcement can offer no reason for the significant

16

preaccusatorial delay and the delay was clearly negligent." CP at 82. The State does not challenge this conclusion of law.

5.    Balancing Test

The third prong in the due process analysis is for the court to "weigh the reasons for delay and the prejudice to determine whether fundamental conceptions of justice would be violated by allowing the prosecution." *Maynard*, 183 Wn.2d at 259. "The core question is whether the action by the government violates fundamental conceptions of justice." *Oppelt*, 172 Wn.2d at 292. Again, we review this balancing de novo after examining the record. *Id.* at 290.

The trial court concluded, "In weighing the reason for the delay, that there was none, and the prejudice, the Court determines that this balancing test falls squarely in favor of the Defendant in that fundamental concepts of justice would not be met if the case was allowed to proceed." CP at 82.

The State's only argument is that the trial court erred in finding actual prejudice, and therefore the court should not have reached the balancing prong. But we have held above that the cumulative effect of the lost evidence did cause actual prejudice to Keen. Therefore, we reject the State's argument.

We must weigh the absence of any reason for the State's delay other than negligence against the actual prejudice caused to Keen by the cumulative effect of Woo's refusal to cooperate and the unavailability of Teagle, the Chevron clerk, and Johnson. After conducting our own balancing, we conclude that "fundamental conceptions of justice would be violated by allowing the prosecution." *Maynard*, 183 Wn.2d at 259. Because of the missing evidence, Keen's due process rights would have been violated if the prosecution had been allowed to go forward.

Accordingly, we hold that the trial court did not err in dismissing the second degree rape charge against Keen for a violation of due process based on preaccusatorial delay.

B.   DISMISSAL UNDER CrR 8.3(b)

As an alternative ground, the trial court dismissed the rape charge against Keen for governmental mismanagement under CrR 8.3(b). We conclude that the trial court did not err in dismissing the charge under CrR 8.3(b).

1.   Legal Principles

CrR 8.3(b) provides the trial court with authority to dismiss a criminal prosecution based on government misconduct:

> The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial. The court shall set forth its reasons in a written order.

To justify dismissal under CrR 8.3(b), the defendant must show that (1) arbitrary action or governmental misconduct occurred and (2) the misconduct caused prejudice affecting the defendant's right to a fair trial. *State v. Barry*, 184 Wn. App. 790, 797, 339 P.3d 200 (2014). Government misconduct does not require that the State act dishonestly or in bad faith. *State v. Kone*, 165 Wn. App. 420, 433, 266 P.3d 916 (2011). Simple mismanagement is enough. *Id.*

The CrR 8.3(b) requirements are similar to the preaccusatorial delay due process requirements. *Oppelt*, 172 Wn.2d at 297. "Preaccusatorial delay can be understood as a subcategory of government misconduct under CrR 8.3(b)." *Id.* As a result, "[a] preaccusatorial delay analysis under CrR 8.3(b) is substantially the same as the due process balancing analysis." *Id.*

To show prejudice as required under CrR 8.3(b), a defendant must do more than generally allege prejudice to his fair trial rights or show a mere possibility of prejudice. *See*

*State v. Salgado-Mendoza*, 189 Wn.2d 420, 432, 403 P.3d 45 (2017) (addressing CrRLJ 8.3(b)). The defendant must show actual prejudice. *Id.* at 431-32. As the rule states, dismissal is appropriate only when the government's misconduct prejudices the rights of the defendant in a manner that materially affects his or her right to a fair trial. CrR 8.3(b); *State v. Garza*, 99 Wn. App. 291, 295, 994 P.2d 868 (2000). "A defendant may be impermissibly prejudiced if a late disclosure compels him to choose between his right to a speedy trial and his right to be represented by adequately prepared counsel." *Salgado-Mendoza*, 189 Wn.2d at 436.

A significant difference between the CrR 8.3(b) analysis and the preaccusatorial delay analysis is that we review a trial court's dismissal ruling under CrR 8.3(b) for an abuse of discretion. *Salgado-Mendoza*, 189 Wn.2d at 427. The trial court abuses its discretion by making a decision that is manifestly unreasonable or based on untenable grounds. *Id.* However, the trial court's discretion must be exercised in light of the fact that dismissal is an extraordinary remedy. *See State v. Rohrich*, 149 Wn.2d 647, 653, 71 P.3d 638 (2003).

2.   Analysis

Here, the trial court concluded, "Under CrR 8.3(b) analysis, the government committed governmental mismanagement of its case for the reasons stated above and offered no reasonable explanation for the delay." CP at 82. The trial court further concluded that

> This government mismanagement of the case has prejudiced the Defendant's right to a fair trial in that given the current speedy trial and current trial date as well as the enormity of the charge and evidence that still to date cannot be produced due to pre-accusatorial delay, the Defendant would be forced to face a *Hobson's choice* between his right to properly defend himself and his right to a speedy trial.

CP at 82-83.

The State argues that, even though the delay in bringing the charge against Keen was negligent, the trial court abused its discretion in dismissing the case under CrR 8.3(b) because Keen failed to show the delay prejudiced his right to a fair trial.

We rejected a similar argument above. Keen demonstrated that the delay prejudiced his right to a fair trial in that he lost the ability to locate and contact many witnesses that were potentially critical to his defense. We conclude that the trial court did not abuse its discretion in determining that the State's delay caused actual prejudice.

The State also argues that the trial court abused its discretion in dismissing the case under CrR 8.3(b) because Keen failed to show that as a result of the delay he would be forced to face a choice between his right to properly defend himself and his right to a speedy trial.

Here, defense counsel told the court that even if the State was able to produce all the missing witnesses before trial, he would still not have a meaningful ability to adequately prepare a defense given the proximity of trial. Trial was set to begin on March 4, 2019, and Keen's time for trial deadline under CrR 3.3(b) was March 18. There were 10 days between the February 22 motion to dismiss hearing and the trial date and 24 days between the hearing and the time for trial deadline.

It is possible that Woo could have been located and compelled to attend trial before the time for trial deadline. But there is no indication that during that time frame, Keen's counsel would have been able to interview her and adequately prepare for her testimony. And there is no indication that Teagle, the Chevron clerk, or Johnson could have been located by the time for trial deadline. So Keen either would have had to go to trial without those witnesses or waive his right to a speedy trial in the hope of locating them later.

We hold that the trial court did not abuse its discretion dismissing the second degree rape charge under CrR 8.3(b).

CONCLUSION

We affirm the trial court's dismissal with prejudice of the second degree rape charge against Keen.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

I concur:

LEE, C.J.

21

GLASGOW, J. (dissenting)—The trial court dismissed with prejudice the charge of second degree rape against Daniel Ludwig Keen because witnesses had not been located, but the court did so a full three weeks before the time for trial period was set to expire. The trial court should not have resorted to the extraordinary remedy of dismissal without requiring the parties to engage in additional attempts to locate the missing witnesses and have them interviewed.

In addition, in order to justify the extraordinary remedy of dismissal, Keen had to show that *actual* prejudice resulted from the preaccusatorial delay. The case law is clear that unavailability of witnesses and evidence does not, without more, show actual prejudice.

Because Keen was charged with second degree rape, the key factual issue at trial was whether the victim was incapable of consent by reason of being physically helpless or mentally incapacitated. On the issue of how intoxicated the victim was, all of the initial witness statements agreed: she was drunk enough to vomit and lose consciousness.

Testimony consistent with these statements would only have harmed Keen's defense. And it is pure speculation to assume that these witnesses, if located, would have said something different from what they told police shortly after the incident. Similarly, there is no suggestion in this record that the sexual assault nurse would have testified in any way that was helpful to Keen. In other words, the actual evidence in the record shows that the absence of these witnesses who could have corroborated the victim's version of events was far more likely to be helpful, not harmful, to Keen.

I would hold that the trial court erred by resorting to dismissal more than three weeks before the expiration of the time for trial. To the extent that the unavailability of witnesses prejudiced Keen, I would hold that the prejudice was slight and insufficient to warrant dismissal where the

State's delay was, at worst, the result of negligence and not intentional or deliberate conduct. Therefore, I dissent.

PREACCUSATORIAL DELAY AND CrR 8.3(B)

We review de novo whether due process rights are violated by a preaccusatorial delay. *State v. Oppelt*, 172 Wn.2d 285, 290, 257 P.3d 653 (2011). We examine the entire record to determine prejudice and to consider the delay in light of the prejudice. *Id*. The defendant must show actual prejudice from the delay. *Id.* at 295. And where mere negligence caused the delay, the prejudice suffered by the defendant must be greater than where intentional or deliberate government conduct is alleged. *Id*. at 293. Where the defendant shows actual prejudice from the delay, we then consider the reasons for the delay and the resulting prejudice to determine whether fundamental conceptions of justice would be violated by allowing prosecution. *Id*. at 295. The defendant must show actual prejudice affecting their fair trial rights under CrR 8.3(b) as well. *Id.* at 297.

The majority states, "We must weigh the absence of any reason for the State's delay other than negligence against the actual prejudice caused to Keen." Majority at 17. But this statement changes a key portion of the balancing test articulated in *Oppelt*. In *Oppelt* the Supreme Court clarified that the balancing conducted when assessing a claim of preaccusatorial delay is not a question of whether the State is able to justify the delay, but rather is an analytical tool to determine whether a delay has violated fundamental conceptions of justice. 172 Wn.2d at 295 & n.8 ("[I]t does not really make sense to balance the reasons for delay *against* the prejudice. . . . It may be more accurate to think of the items as factors that must be considered in determining whether fundamental notions of justice are offended by the prosecution."). Where the State's reason for delay is, at worst, mere negligence, a defendant who shows slight prejudice is not entitled to

dismissal simply due to the State's inability to justify the delay. Rather, in such instances, the defendant bears the burden of showing greater prejudice. *Id.* at 296.

A.      Premature Dismissal

Dismissal is an extraordinary remedy and should only be employed as a last resort. *State v. Wilson*, 149 Wn.2d 1, 12, 65 P.3d 657 (2003). In *Wilson*, the Supreme Court held that the extraordinary remedy of dismissal should not have occurred until time for trial expiration became an issue. *Id.* And it is well established that dismissal is not appropriate before considering "'intermediate remedial steps.'" *Id.* (quoting *State v. Koerber*, 85 Wn. App. 1, 4, 931 P.2d 904 (1996)).

Dismissal based on Keen's inability to locate Kimberly R. Woo and Kyle Teagle was particularly premature here where the time for trial expiration was still more than three weeks away. *Id.* The majority acknowledges that there may have been the time and ability to compel Woo's attendance at trial. Majority at 12. Keen was not being forced to choose between a timely trial and locating witnesses. There was no reason for the trial court not to allow more time for Keen and the State to attempt to locate the witnesses at least up to a few days before the time for trial deadline. Dismissal was not yet necessary as a last resort, and the trial court abused its discretion when it dismissed rather than allowing the parties to continue to try to locate these witnesses.

The majority reasons that even if located, the defense would not have had time to adequately prepare for trial before the time for trial deadline expired in any event, so the trial court properly dismissed the charges. But that reasoning places too little faith in the abilities of Keen's defense team. Based on police reports, Keen was well aware of what Woo and Teagle told police at the time of the alleged rape—that the victim was intoxicated enough to vomit and she lost consciousness or was unable to stay awake. Perhaps if Woo and Teagle said something remarkably

different and somehow more harmful to Keen in a pretrial interview, then the defense could argue an inability to prepare for trial in time in light of the surprise. The same is true regarding Wendy Johnson, the sexual assault examination nurse, the content of whose potential testimony could reasonably be anticipated. But the extraordinary step of dismissal was not warranted at the time the trial court granted the motion to dismiss.

B.      Lack of Actual Prejudice

In *Oppelt*, the Supreme Court held that the deteriorated memory of a key witness was insufficient to support a claim that Oppelt's due process rights were violated by the State's negligent delay in bringing charges. 172 Wn.2d at 296. There, a minor victim told her great-grandmother that her stepfather had molested her. *Id.* at 287. The great-grandmother gave the child lotion to apply to her vagina. *Id.* When a nurse examined the victim, she observed redness and swelling of the genitalia. *Id.* The State did not charge Oppelt with child molestation until six years later, at which time the great-grandmother could not recall what lotion she had given the child. *Id.* at 287-88, 296. Oppelt argued that the charge should be dismissed for preaccusatorial delay, but the court disagreed, holding that the loss of testimony was only very slight prejudice because it did not preclude Oppelt from arguing that the lotion caused the victim's redness and swelling. *Id.* at 296. The Supreme Court emphasized that "[w]here the State's reason for delay is mere negligence, establishing a due process violation requires greater prejudice to the defendant than cases of intentional bad faith delay." *Id.*

In *State v. McConnell*, 178 Wn. App. 592, 607, 315 P.3d 586 (2013), Division One rejected the argument that the State's 12-year delay violated McConnell's due process rights. There, McConnell, who was charged with first degree rape, argued that the State's delay prejudiced him because his mother passed away and could no longer testify as an alibi or fact witness and because

the State had destroyed all of the evidence collected in the case. *Id.* The evidence—including a sweater believed to be worn by the suspect, plaster casts of the suspect's bicycle tracks, and photographs of the crime scene and the victim's injuries—was all destroyed during the 12-year delay. *Id.* at 607. Despite the lengthy delay and substantial evidence loss, Division One rejected McConnell's argument that the preaccusatorial delay violated his due process rights. *Id.* at 608. The court explained that McConnell did not identify what his mother's testimony would have shown or how the destruction of evidence resulted in actual prejudice. *Id.* at 607. Accordingly, the court held that McConnell could not show that allowing the prosecution to move forward would violate the fundamental conceptions of justice. *Id.* at 608.

As in *Oppelt* and *McConnell*, it is not enough to show that witness testimony or evidence lost to time *may be* relevant or that a witness *may have* said something helpful to the defense; Keen must show that the absence of that testimony and evidence actually prejudices his defense. He fails to do so. *See United States v. Mills*, 641 F.2d 785, 788 (9th Cir. 1981) (explaining that the proof of actual prejudice must be definite not speculative, and holding that the appellant failed to show actual prejudice from the preindictment delay based on missing witnesses where the appellant could not relate what the substance of their testimony would have been). Keen does not identify what the missing witnesses' testimony would have shown if called to testify. Indeed, if Woo and Teagle testified consistent with what they told police just after the incident, their testimony would support the State's theory of the case. They told police that the victim was drunk enough to vomit and that she was losing consciousness. And Keen himself told police that the victim was vomiting and passing out in the vehicle before Keen left. It was essentially undisputed that the victim was intoxicated enough to lose consciousness.

In light of the undisputed evidence in the record, it is far more likely that testimony from Woo and Teagle would have been harmful to Keen, not helpful to him. And it was his burden to show actual prejudice.

Similarly, Johnson's absence was at least as likely to be helpful to Keen, rather than harmful. Keen fails to identify anything to support his speculation that Johnson's testimony could have been helpful to him. And the majority's willingness to assume prejudice, rather than ensure Keen met his burden to show actual prejudice, is particularly alarming when considering Johnson's absence. Under the majority's reasoning, every time an arguably negligent delay in a cold case or a case involving a testing backlog has made it impossible to call the person who collected physical evidence of sexual assault, our ability to imagine that the sexual assault examiner might say something helpful to the defendant would require dismissal.

The majority also makes much of Keen's inability to locate any witnesses from the Chevron who worked on the night of the incident. Majority at 13-14. But neither the majority opinion nor Keen identifies how any witnesses from the Chevron would have benefitted Keen's defense. That the Chevron clerk may have been able to provide some testimony about the victim's level of intoxication is insufficient to show prejudice from the witness's absence because such testimony likely would have been cumulative. Although the trial court found that Woo, Teagle, Keen, and the victim reported "very different" accounts of the details of the night in question, there appears to be little dispute in the record over the victim's intoxication. Clerk's Papers at 88.

Keen relies on nothing more than speculation that the missing witnesses could provide testimony helpful to his defense. More is required to show actual prejudice. *Mills*, 641 F.2d at 788. Moreover, the absence of these witnesses does not preclude Keen from arguing that the victim was not incapacitated and that any sexual contact between the two of them was consensual. It is far

27

more likely that Keen is better off for not having witnesses offer testimony that is consistent with what they told police shortly after the incident.

Ultimately, the State bears the burden of proof in a criminal trial. Missing evidence and nearly 10-year-old witness memories cut at least equally, if not stronger, against the State, which bears the burden of proving each element of the charge beyond a reasonable doubt. If the State chooses to proceed to trial with little or no corroboration of the victim's account of events, we should not predetermine the credibility of witness testimony; that should remain a matter for the trier of fact. *See State v. Rohrich*, 149 Wn.2d 647, 659, 71 P.3d 638 (2003).

C.    Fundamental Conceptions of Justice

The final prong of the test for determining whether preaccusatorial delay warrants dismissal requires us to consider the reasons for the delay and the prejudice identified to determine whether fundamental conceptions of justice would be violated by allowing prosecution. *Oppelt*, 172 Wn.2d at 295. "Fundamental conceptions of justice" is a broad term that does not limit itself to viewing the circumstances only from the perspective of the State or the defendant. The victim should be considered as well. Here, the majority fails to recognize or address the victim's interests in proceeding to trial.

Courts should be especially mindful when performing this balancing in sexual assault and rape cases given the multiple reasons that testing of DNA collection kits has historically been delayed through no fault of the victim. As our State continues its progress toward clearing the backlog of these kits, many cold cases will be revisited years after DNA was collected. Witness availability and memory erosion will inevitably occur, and there will likely be many situations where the person who collected a sexual assault kit is no longer available to testify. Where a preaccusatorial delay is not the result of deliberate State action, this final balancing must take into

account the victim's interests when considering fundamental conceptions of justice. Dismissal based on the mere possibility of prejudice, rather than a showing of actual prejudice, does not comport with fundamental conceptions of justice.

On this record, I would conclude that allowing prosecution in this case would not violate fundamental conceptions of justice. Keen should have his day in court, and the jury should be permitted to weigh the available evidence to determine whether the State has carried its burden to prove beyond a reasonable doubt that Keen committed second degree rape. At the very least, dismissal here was premature because the trial court resorted to dismissal first, rather than allowing the State to continue to locate the witnesses until the time for trial period was about to expire.

I would reverse the trial court's order dismissing the case and remand for the case to continue to trial in due course.

I dissent.

Glasgow, J.